IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FILED**

AUG 9 2012

**U.S. COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| NICHOLE MEDICAL EQUIPMENT & SUPPLY, INC. and DOMINIC ROTELLA | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No.: 12-cv-00364 ) Judge Eric G. Bruggink |
| UNITED STATES OF AMERICA | ) ) |
| Defendant | ) ) ) ) ) |

*Transfer*

~~AMENDED~~ COMPLAINT

### Parties

1.  Plaintiff, Nichole Medical Equipment & Supply, Inc. ("Nichole Medical") is a business

    corporation organized and existing by virtue of the laws of the Commonwealth of

    Pennsylvania with a principal place of business therein.  At all relevant times, Nichole

    Medical was an authorized supplier of Durable Medical Equipment, Prosthetics,

    Orthotics and Supplies ("DMEPOS") in Region A, which includes Pennsylvania.

2.  At all relevant times, Plaintiff Dominic Rotella ("Rotella"), an adult individual, was the

    President of and the owner of all outstanding shares of stock in Nichole Medical and a

    resident of the Commonwealth of Pennsylvania.

3.  Defendant, the United States of America ("United States"), is a sovereign nation.  At all

    times relevant the United States Department of Health and Human Services (HHS), by

    and through its Centers for Medicare & Medicaid Services (CMS) employed third-party

    Durable Medical Equipment Regional Carriers ("DMERCs") and Program Safeguard

    Contractors ("PSCs") to perform selected Medicare program and program integrity tasks.

4.    At all times relevant, the United States acted or failed to act individually, or through its

directors, officers, agents, servants and/or employees within the course and scope of their

agency or employment.

## Jurisdiction and Venue

5.    On or amount March 28, 2012 and pursuant to 28 U.S.C. §1631, this action was ordered

transferred to the Court of Federal Claims by Order by the United States District Court

for the Eastern District of Pennsylvania. *Nichole Medical Equipment & Supply, Inc. v.*

*United States*, USDC-EDPa, Case. No. 11-cv-01107-CMR.

## General Allegations

### *Medicare Contractors*

6.    TriCenturion, Inc. ("TriCenturion") is a business corporation organized and existing by

virtue of the laws of the State of Delaware with a principal place of business in

Columbia, South Carolina. TriCenturion, Inc. is the successor of TriCenturion, LLC. At

all relevant times, TriCenturion has been a PSC under contract with CMS) to perform

selected Medicare program integrity tasks. At all relevant times, TriCenturion was the

PSC for the Region A DMERC, which includes Pennsylvania.

7.    In a related action, *Nichole Medical Equipment & Supply, Inc. v. TriCenturion, et. al.*,

United States District Court, Eastern District of Pennsylvania No. 2:10-cv-00389-CMR,

the United States, acting on behalf of Defendant TriCenturion, asserts that all actions

taken by TriCenturion, including but not limited to actions which violated federal law and

regulations, were taken under the direction of the Secretary of Health and Human

Services ("Secretary"). The United States further asserts that TriCenturion is entitled to

"official immunity." The United States asserts that TriCenturion, in its capacity and actions as a PSC, is the United States.

8.  National Heritage Insurance Company also d/b/a NHIC, Corp. ("NHIC") is a business corporation organized and existing by virtue of the laws of the State of Texas with a principal place business therein. At all relevant times, NHIC has been the DMERC for the 24,000 suppliers of Durable Medical Equipment, Prosthetics, Orthotics and Supplies in Region A, which includes Pennsylvania.

9.  In a related action, *Nichole Medical Equipment & Supply, Inc. v. TriCenturion, et. al.*, United States District Court, Eastern District of Pennsylvania No. 2:10-cv-00389-CMR, the United States, acting on behalf of Defendant NHIC, asserts that all actions taken by NHIC, including but not limited to actions which violated federal law and regulations, were taken under the direction of the Secretary. The United States further asserts that NHIC is entitled to "official immunity." The United States asserts that NHIC, in its capacity and actions as a DMERC, is the United States.

*The Incontinence Products Action*

10. In 1998, and upon information and belief, in response to an anonymous tip from a disgruntled former employee, in February of 2000, the Federal Bureau of Investigation and others conducted an unannounced search and seizure of Nichole Medical's records.

11. Thereafter, in July 2000, a grand jury was impaneled and, upon information and belief, the United States failed to obtain an indictment.

12. Several years later, on March 3, 2004, the United States and the Commonwealth of Pennsylvania ("Commonwealth") commenced a civil action ("The Incontinence Products Action") against Rotella, Nichole Medical and others, alleging causes of action for false

clams, fraud, unjust enrichment and breach of contract regarding the exact same payments that were the subject of original FBI investigation and failed attempt to obtain a grand jury indictment.  The Complaint focused exclusively on Nichole Medical's billing for incontinence supplies (*e.g.* bed pads and briefs).

13.     The United States undertook extensive discovery which revealed some billing errors, but no evidence of fraud or similar intent.

14.     The cost and expense of defending Nichole Medical and its employees against the United States' repeated attempts at prosecution, and the virtually unlimited resources of the government, overwhelmed and debilitated Nichole Medical's business.

15.     Settlement conferences were held with Judge Jacob P. Hart in 2005 which ultimately resulted in a Settlement Agreement.

16.     By Order dated October 5, 2005 (Doc. No. 26), the Incontinence Products Action was removed from the "Active" docket and moved to the "Civil Suspense" docket pending completion of a final draft of the Settlement Agreement.

17.     The Settlement Agreement that was ultimately reached, among other things, allowed Nichole Medical to continue its on-going business, including business with Medicare and Medicaid, provided:

   a.     Nichole Medical and Rotella would make one substantial and thereafter equal monthly installments to payoff the Settlement Amount over a period of five (5) years, *Settlement Agreement* at p. 3, Sec. III, ¶1 a true and correct copy of which is attached at **Exhibit A**; and

b.      Nichole Medical, Rotella and co-defendant William Tresca would enter into an Integrity Agreement with the Office of the Inspector General ("OIG") and the Department of Health & Human Services ("HHS").

18.   With the ability to continue its on-going business, including business with Medicare and Medicaid, Rotella and Nichole Medical could reasonably and truthfully represent that they were solvent and would remain solvent for the duration of the financial obligations imposed by the Settlement Agreement.

19.   In consideration of these obligations, the United States, the Commonwealth and OIG-HHS released Nichole Medical and Rotella "from any civil or administrative monetary claim… for the Covered Conduct."

20.   Rotella, as President of Nichole Medical, understood its problems with CMS, Medicare and Medicaid had been brought to an end.

21.   By Order dated January 30, 2006 (Doc. No. 29), the Incontinence Products Action was transferred from the "Civil Suspense" to the "Active" docket for final disposition. And, by further Order of the same date (Doc. No. 30), and pursuant to Local Rule 41.1(b), the Incontinence Products Action was dismissed with prejudice.

22.   Nichole Medical made its initial payment of $150,000 under the Settlement Agreement and thereafter made two additional payments of $11,322.74 for a total of $172,645.48.

*The Wheelchair/Bed Action*

23.   An investigation regarding wheelchairs and hospital beds, upon information and belief, prompted by the same anonymous tip from a disgruntled former employee, had begun long *before* the United States commenced the Incontinence Products Action in March 2004.

24.     TriCenturion conducted an unannounced, unauthorized and illegal search and seizure of Nichole Medical's Medicare records on or about May 20, 2002.

25.     Although no wrongful conduct was found, TriCenturion relentlessly pursued Nichole Medical, demanding that charges be filed on at least two occasions.

26.     "In both 2001 and 2004, the case was returned to [Tri-Centurion] by OIG because the Assistant U.S. Attorney declined to pursue a fraud case against [Nichole Medical]." Decision of Medicare Appeals Council, January 31, 2008 at p. 4 attached at **Exhibit B**.

27.     TriCenturion was undaunted by the repeated official rejections of its allegations against Nichole Medical.

28.     Shortly after the United States commenced the Incontinence Products Action, on June 29, 2004, and in an attempt to "bootstrap" its own Wheelchair/Bed Action to the Incontinence Products Action, Tri-Centurion issued a notice of overpayment to Nichole Medical.

29.     TriCenturion relentlessly pursued Nichole Medical based upon speculative, incompetently produced, and erroneous "extrapolations" which allegedly "showed that [Nichole Medical] *might* be billing inappropriately for motorized wheelchairs and semi-electric hospital beds."

30.     In September 2004, and at the request and direction of TriCenturion, HealthNow, then the Region A DMERC, commenced an improper 100% offset against payments due Nichole Medical.

31.     The improper offset in September 2004 interfered with Nichole Medical's ability to provide for its defense in the Incontinence Products Action, but after counsel intervened on Nichole Medical's behalf, HealthNow reversed its position.

32. With the TriCenturion's false and malicious allegations apparently resolved, in January 2006, Rotella and Nichole Medical entered into the Settlement Agreement with the United States understanding that it would end all problems with United States, Medicare and Medicaid.

33. Again, TriCenturion was undaunted by the repeated rejections of its false allegations against Nichole Medical.

34. In July 2006, NHIC succeeded HealthNow as the Region A DMERC and, at the request and direction of TriCenturion, promptly re-instituted the HealthNow's previously suspended improper offset.

35. The July 2006 action effectively precluded Nichole Medical from being able to service its monthly obligations under pursuant to the Settlement Agreement that had been completed several months earlier, and ultimately led to Nichole Medical's demise.

36. Nichole Medical closed its doors and ended its on-going business operations in January 2007. However, Nichole Medical pressed forward with appeals in the Wheelchair/Bed Action.

37. In February 2007, an Administrative Law Judge concluded that certain claims could be paid and also found that "'to enforce the results of the [TriCenturion] extrapolation is unreasonable' because written notice was not given to Nichole Medical that any claims were to be reopened, that there was no new evidence to justify the reopening, and '[TriCenturion] failed to describe adequately the constitution of the two universes which would have afforded the opportunity... to recalculate the projected overpayment." Exhibit B at p. 3, quoting Decision of Administrative Law Judge Philip Baten, Feb. 12, 2007, pp. 26-27, a true and correct copy of which attached at **Exhibit C**.

38.    In January 2008, the Medicare Appeals Council:

    a.    Rejected TriCenturion's attempt to "bootstrap" the Wheelchair/Bed Action to the Incontinence Products Action stating "when this case became one of administrative overpayment rather than alleged fraud, CMS was required to follow the binding regulations of 42 C.F.R. 405.842(a);"

    b.    Found that TriCenturion failed to provide proper notice "which would include a list of the claims being reopened and the reasons for the reopening."

    c.    Found that TriCenturion failed to properly reopen claims;

    d.    Found that "[b]ecause there is *no evidence of fraud* or similar fault in this case, those claims were not subject to reopening." (Emphasis added)

    e.    Found "no new and material evidence to support reopening of the initial determinations under 42 C.R.R. 405.841; and

    f.    Concluded that "CMS and [TriCenturion] did not properly reopen the initial determination in the claims at issue pursuant to the applicable regulations."

39.    The Decision of the Medicare Appeals Council was fully favorable to Nichole Medical.

40.    While Nichole Medical was ultimately successful in its administrative appeals, the insolvency caused by the wrongful conduct of TriCenturion and NHIC in the Wheelchair/Bed Action was irreparable.

*Enforcement of the Settlement Agreement*
*in the Incontinence Products Action*

41.    After the Decision of the Medicare Appeal Council became final, improper offsets totaling approximately $101,201.44 should have been paid to Nichole Medical. However, the United States has failed and refuses to comply with the final and binding decision of the Medicare Appeals Council.

42.  Having relied on TriCenturion's and NHIC's wrongful and illegal conduct to complete the task of destroying Nichole Medical's business, on or about April 1, 2009, the United States attempted to seize the improper offsets totaling approximately $101,201.44 that should have been paid to Nichole Medical with a motion to enforce the Settlement Agreement.

43.  The United States' motion to enforce the Settlement Agreement was denied by Order dated March 8, 2010.

44.  Undaunted by any Decision of the Medicare Appeals Counsel or any Order of the District Court, one or more persons identified only as "Department of Justice and CMS counsel" have issued secret extra-judicial directives to NHIC instructing NHIC to withhold any payment to Nichole Medical and not to comply with the final binding decision of the Medicare Appeals Council.

45.  The United States, the Department of Justice, HHS, CMS, and NHIC each refuse to identify the person(s) issuing the secret extra-judicial directives.

## FIRST CLAIM FOR RELIEF
*Declaratory Judgment- 28 U.S.C. §2201, et. seq.*

46.  Plaintiffs incorporate all paragraphs herein by reference as though fully set forth at length.

47.  An actual controversy exists between the parties regarding the effect and enforceability of the Settlement Agreement.

48.  On or about January 27, 2006, Nichole Medical, the United States, the Commonwealth, and other identified Nichole Medical employees, entered into a Settlement Agreement.

49.     In the Settlement Agreement the Defendant expressly or impliedly warranted, represented and/or agreed to conduct business with Nichole Medical within the applicable legal and regulatory structure.

50.     The Defendant's representations were false.

51.     The Defendant breached the agreement with Nichole Medical.

52.     After entering into the Settlement Agreement, the United States, its constituent agencies, departments and contractors, without reasonable or probable cause, conducted improper and illegal raids, audits, and/or reopenings of investigations, violated applicable statutes and regulations, and improperly suspended and/or setoff payments to Nichole Medical, all without reasonable or probable cause, and in violation of the duty of good faith and fair dealing.

53.     The Defendant failed and refused to cure their breaches, which cure is a condition precedent to each and every remaining duty of the Plaintiffs under the Settlement Agreement.

54.     The Defendant's wrongful conduct caused Plaintiffs' to default.

55.     The Defendant's wrongful conduct caused Nichole Medical to become insolvent.

56.     The Defendant's wrongful conduct renders the Settlement Agreement void and/or unenforceable.

        WHEREFORE, Plaintiffs pray following their final claim for relief.

## SECOND CLAIM FOR RELIEF
*Breach of Contract*

57.     Plaintiffs incorporate all paragraphs herein by reference as though fully set forth at length.

58.     After entering into the Settlement Agreement, the Defendant, its constituent agencies, departments and contractors, without reasonable or probable cause, conducted improper and illegal raids, audits, and/or reopenings of investigations, violated applicable statutes and regulations, and improperly suspended and/or setoff payments to Nichole Medical, all without reasonable or probable cause, and in violation of the duty of good faith and fair dealing, including, but not limited to:

a.      failing to provide proper notice which would include a list of the claims being reopened and the reasons for the reopening;

b.      failing to properly reopen claims;

c.      reopening claims when there is no evidence of fraud or similar fault;

d.      attempting to open claims when there was no new and material evidence to support reopening of the initial determinations;

e.      failing to properly reopen the initial determination in the claims at issue pursuant to the applicable regulations;

f.      instituting improper offset(s);

g.      failure to provide due care under the circumstances; and

h.      intentionally and deliberately defying and refusing to comply with a valid, binding and final Order of the Medicare Appeals Council;

i.      failing to act in fairly and in good faith;

j.      such other and further breaches that may be revealed in discovery.

59.     The Defendant failed and refused to cure their breaches, which cure is a condition precedent to each and every remaining duty of the Plaintiffs under the Settlement Agreement.

60.   As a direct and proximate result of the Defendant's wrongful conduct and breaches,

Nichole Medical suffered injuries, damages and losses more fully alleged above.

WHEREFORE, Plaintiffs pray following its final claim for relief.

### THIRD CLAIM FOR RELIEF
*Misrepresentation – Rescission*

61.   Plaintiffs incorporate all paragraphs herein by reference as though fully set forth at

length.

62.   On or about January 27, 2006, Nichole Medical, the United States, Pennsylvania, and

other identified Nichole Medical employees, entered into a Settlement Agreement.

63.   In the Settlement Agreement the Defendant expressly or impliedly warranted, represented

and/or agreed to conduct business with Nichole Medical within the applicable legal and

regulatory structure.

64.   The Plaintiffs relied on the Defendant's representations to their detriment.

65.   The Defendant's representations were false.

66.   As a direct and proximate result of the Defendant's wrongful conduct and fraud, Nichole

Medical suffered injuries, damages and losses more fully alleged above.

67.   The Defendant's misrepresentation, fraudulent inducement and/or other wrongful

conduct renders the Settlement Agreement void and/or unenforceable.

WHEREFORE, Plaintiffs pray for the following:

(1)   An Order declaring that the January 24, 2006 Settlement Agreement is null and

void *ab initio*; that any and all payments previously made pursuant to the

Settlement Agreement shall be refunded to Plaintiff Nichole Medical Equipment

and Supply, Inc.; and that the Department of Health and Human Services, Centers

of Medicare and Medicaid Services and/or its contractors, shall in conformity

@0002/0002

with the January 31, 2008 Decision of the Medicare Appeals Council, direct payment of any and all previously offset amounts to Nichole Medical Equipment & Supply, Inc.;

(2)   An award of damages in favor of the Plaintiffs and against the Defendant, sufficient to compensate them for all injuries, damages and losses, including, but not limited to, the $172,645.48 previously paid and the $101,201.44 owed and wrongfully withheld;

(3)   Statutory and pre-judgment interest as provided by law;

(4)   Costs and attorney's fees as provided by law; and

(5)   Such other and further relief as this Court deems just and appropriate.

DATED: August 9, 2012

VILLARI BRANDES & GIANNONE, P.C.

David M. Hollar
8 Tower Bridge, Suite 400
161 Washington Street
Conshohocken, PA 19428
(610) 729-2900
Fax (610) 729-2910

# EXHIBIT A
## TO
## Amended Complaint

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES and COMMONWEALTH OF PENNSYLVANIA | : : : |
| PLAINTIFFS, | : : |
| V. | : :   CIVIL ACTION NO. 04-946 |
| DOMINIC P. ROTELLA, WILLIAM TRESCA, LORRAINE OLIVERAS and NICHOLE MEDICAL AND EQUIPMENT SUPPLY, INC., | : : : : : |
| DEFENDANTS. | : |

## SETTLEMENT AGREEMENT

### I. PARTIES

This Settlement Agreement (Agreement) is entered into among the plaintiff United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General ("OIG-HHS") of the Department of Health and Human Services ("HHS") (the "United States"); plaintiff Commonwealth of Pennsylvania acting through the Office of the Attorney General ("Commonwealth");  Defendant Dominic Rotella ("Rotella"); Defendant William Tresca ("Tresca"): Defendant Lorraine Oliveras ("Oliveras") and Defendant Nichole Medical Equipment & Supply, Inc. ("Nichole Medical") (hereafter collectively referred to as "the Parties"), through their authorized representatives.

## II. PREAMBLE

As a preamble to this Agreement, the Parties agree to the following:

1.      Defendant Nichole Medical is a Pennsylvania corporation with its principal place of business at 2200 Michner Street, Philadelphia, Pennsylvania.  At all times since about June 1986, Nichole Medical has been an authorized Medical Assistance provider in the Commonwealth of Pennsylvania.  Since June 1986, defendant Nichole Medical has delivered adult incontinence supplies to Pennsylvania Medical Assistance enrollees who resided in certain Philadelphia area Personal Care Homes and has obtained reimbursement for those incontinence supplies from the Pennsylvania Medical Assistance Program.

2.      On or about March 3, 2003 the United States and the Commonwealth filed a complaint in which they contended that Nichole Medical,  Dominic Rotella, William Tresca, and Loraine Oliveras submitted or caused to be submitted claims for payment to the Pennsylvania Medical Assistance Program, 42 U.S.C. §§ 1396-1396v, and the Medicare Program  (Medicare), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg.

3.      In the Complaint the United States and the Commonwealth contended that defendants Nichole Medical's,  Rotella's, Tresca's, and Oliveras' submission of certain Medicare and Medicaid claims for incontinence supplies during the period from January 1996 to February 2000 rendered those defendants liable: (i) under the civil False Claims Act; and/or (ii) the common law theories of fraud, unjust enrichment/restitution, and breach of contract.  This conduct, relating to Medicaid and Medicare claims between 1996 and 2000 as described in the Complaint, will be referred to collectively as the "Covered Conduct."

4.      The United States contends also that it has certain administrative claims against Nichole Medical, Tresca, and Rotella for engaging in the Covered Conduct.

5.     This Agreement is neither an admission of liability by Nichole Medical, Rotella, Tresca, and Oliveras, who deny such liability, nor a concession by the United States and the Commonwealth that their claims are anything other than entirely well founded.  The parties further agree that this Agreement shall not be admissible in any suit or proceeding as evidence or an admission or liability by any Party, except to enforce any term of this Agreement.

6.     To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, the Parties reach a full and final settlement pursuant to the Terms and Conditions below.

III.  TERMS AND CONDITIONS

1.     Nichole Medical and Rotella agree to pay to the United States $ 750,000.00 (the "Settlement Amount").  The first $150,000.00 of the Settlement Amount shall be paid within 30 days of the effective date of this Agreement.  The remainder shall be paid not less than monthly in equal installments such that the Settlement Amount, plus 5% interest on the unpaid balance compounded annually, is fully paid within 5 years of the effective date of this Agreement. Nichole Medical and Rotella agree to pay the Settlement Amount by electronic funds transfer pursuant to written instructions to be provided by the United States.

2.     Nichole Medical, Rotella, and Tresca will undertake the following additional non-monetary settlement obligations (hereinafter collectively non-monetary Settlement Obligations) for the period during which the Integrity Agreement ("IA") is in effect:

a.     Nichole Medical and Rotella will enter into a five year IA with OIG-HHS, attached hereto as Exhibit A, and incorporated into this Agreement by

3

reference.  Nicole Medical and Rotella will upon execution of this Agreement implement their obligations under the IA

b.      No Independent Review Organization or contractor hired by Nichole Medical to perform auditing services in connection with the IA shall be a firm or person who has previously performed services for Rotella or Nichole Medical.

c.      Copies of all reports or correspondence sent to OIG-HHS as a consequence of, or in connection with, the IA will be served upon the U.S. Attorney's Office and the Commonwealth Attorney General's Office.  Likewise, copies of any correspondence or reports generated for or sent to the U.S. Attorney's Office or the Commonwealth Attorney General's Office will also be sent to OIG-HHS.

d.      Nichole Medical and Rotella shall, within 15 days of becoming aware of such allegations, report to the U.S. Attorneys Office and the Commonwealth Attorney General's Office any allegations, whether deemed credible or not, from any source alleging improper conduct by Nichole Medical or any of its employees concerning the delivery of goods or services, the receipt or payment of funds, or the issuing of or collecting on invoices.

e.      Rotella and Tresca shall not directly or indirectly own, operate, be employed by or consult for any business that receives payment from any state or federal program unless that business has: (i) entered into a IA substantially equivalent to that to be executed by Nichole Medical; and (ii) entered into an agreement with both plaintiffs that incorporates the terms of the Agreement to be

executed by the parties.  This provision shall remain in force and effect for as long as the IA is in force, or unless otherwise agreed by and between the Rotella, Tresca, the United States and the Commonwealth.

f.      Rotella will personally review and approve all claims filed by, for or on behalf of Nichole Medical directly or indirectly with any state or federal program or agency within 21 days of the submission of such claims.  Tresca will likewise review all such claims during any time he is employed by Nichole Medical.

g.      Rotella agrees that any material breach of the Agreement by him or by Nichole Medical will result in his voluntary withdrawal from all state and Federal health care reimbursement programs for a period of five years.  Tresca agrees that any material breach of the Agreement by him will result in his voluntary withdrawal from all state and Federal health care reimbursement programs for a period of five years.  A material breach shall include, but shall not be limited to, the submission of any invoices to any federal or state health care reimbursement program for goods or services (i) not actually rendered to the named program or beneficiary or (ii) not accurately described by such invoices.  A material breach shall not include the accidental submission of invoices, inaccurate invoices, and/or inaccurate information and/or data contained in said invoices to any federal or state health care reimbursement program for goods or services (i) not actually rendered to the named program or beneficiary or (ii) not accurately described by such invoices.  Notwithstanding the provisions of this paragraph, any breach of the IA shall be governed by the breach and default provision set

forth therein.  The parties recognize that this voluntary withdrawal is in addition and supplemental to any exclusion powers or authority held by OIG-HHS.

3.      Tresca shall be jointly and severally liable for any and all payments to be made by Nichole Medical or Rotella pursuant to paragraph III(1) above.

4.      Oliveras shall not work for Rotella or Nichole Medical for a period of five years.

5.      Subject to the exceptions in Paragraph 9 below, in consideration of the obligations of Nichole Medical, Rotella, Tresca, and Oliveras set forth in this Agreement, conditioned upon Nichole Medical, Rotella, and/or Tresca making full payment of the Settlement Amount, and satisfaction of their respective Non-Monetary Settlement Obligations as set forth in paragraph III(2), as well as the additional obligations set forth in paragraphs III(3) and (4), and subject to Paragraph 20 below (concerning bankruptcy proceedings commenced within 91 days of any payment under of this Agreement), the United States (on behalf of itself, its officers, agents, agencies, and departments) agrees to release Nichole Medical, Rotella, Tresca, and/or Oliveras as appropriate from any civil or administrative monetary claim the United States has or may have under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of unjust enrichment/restitution, breach of contract, and fraud, for the Covered Conduct.  Pending satisfaction of their respective obligations under this Agreement, and for as long as Nichole Medical, Rotella, Tresca, and Oliveras shall remain in compliance with the terms of this Agreement, the United States covenants not to sue each defendant on the claims and theories set forth in its complaint in this action. Upon breach of this Agreement, however, the United States may elect to sue for such

breach (including for specific performance) or to reinstitute the present suit as to such defendant. In such event any defendant who has breached this agreement shall be treated for statute of limitations purposes as though this suit had never been dismissed.

6.      Subject to the exceptions in Paragraph 9 below, in consideration of the obligations of Nichole Medical, Rotella, Tresca, and Oliveras set forth in this Agreement, conditioned upon Nichole Medical, Rotella, and/or Tresca making full payment of the Settlement Amount, and satisfaction of their respective Non-Monetary Settlement Obligations as set forth in paragraph III(2), as well as the additional obligations set forth in paragraphs III(3) and (4), and subject to Paragraph 20 below (concerning bankruptcy proceedings commenced within 91 days of any payment under of this Agreement), the Commonwealth (on behalf of itself, its officers, agents, agencies, and departments) agrees to release Nichole Medical, Rotella, Tresca, and/or  Oliveras as appropriate from any civil or administrative monetary claim the Commonwealth has or may have under the common law theories of unjust enrichment/restitution, breach of contract, and fraud, for the Covered Conduct.  Pending satisfaction of their respective obligations under this agreement, and for as long as Nichole Medical, Rotella, Tresca, and Oliveras shall remain in compliance with the terms of this Agreement, the Commonwealth covenants not to sue each defendant on the claims and theories set forth in its complaint in this action.  Upon breach of this Agreement, however, the Commonwealth may elect to sue for such breach (including specific performance) or to reinstitute the present suit as to such defendant .  In such event any defendant who has breached this Agreement shall be treated for statute of limitations purposes as though this suit had never been dismissed.

7

7.     In consideration of the obligations of Nichole Medical and Rotella set forth in this Agreement and the IA attached hereto as Exhibit A, and incorporated herein by reference, conditioned upon Nichole Medical's and Rotella's full payment of the Settlement Amount, and subject to Paragraph 20 below (concerning bankruptcy proceedings commenced within 91 days of any payment made under this Agreement), the OIG-HHS agrees to release and refrain from instituting, directing or maintaining any administrative action seeking exclusion from the Medicare, Medicaid, or other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) against Nichole Medical or Rotella under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law), or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited activities), for the Covered Conduct, except as reserved in Paragraph 9, below, and as reserved in this Paragraph.  The OIG-HHS expressly reserves all rights to comply with any statutory obligations to exclude Nichole Medical or Rotella from the Medicare, Medicaid, or other Federal health care program under 42 U.S.C. Section 1320a-7(a)(mandatory exclusion) based upon the Covered Conduct.  Nothing in this Paragraph precludes the OIG-HHS from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 8 and 9, below.

8.     OIG-HHS expressly reserves all rights to institute, direct, or to maintain any administrative action seeking exclusion against Tresca or Oliveras from Medicare, Medicaid, or other Federal health care programs (as defined in 42 U.S.C. §1320a-7b(f) under 42 U.S. C. §1320a-7(a) (mandatory exclusion) or 42 U.S.C. § 1320a-7(b) (permissive exclusion).

9.     Notwithstanding any term of this Agreement, specifically reserved and excluded from the scope and terms of this Agreement as to any entity or person (including Nichole Medical, Rotella, Tresca, and Oliveras) are the following:

a.     Any civil, criminal or administrative liability arising under Title 26, U.S. Code (Internal Revenue Code);

b.     Any criminal liability;

c.     Except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal or state health care programs;

d.     Any liability to the United States or the Commonwealth (or their agencies) for any conduct other than the Covered Conduct;

e.     Any liability based upon such obligations as are created by this Agreement;

f.     Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

g.     Any civil liability of individuals other than Rotella, Tresca or Oliveras and any administrative liability of individuals other than Rotella.

10.    Nichole Medical and Rotella have entered into a IA with OIG-HHS, attached as Exhibit A, which is incorporated into this Agreement by reference. Nichole Medical and Rotella will immediately upon execution of this Agreement implement their obligations under the IA.

11.    Nichole Medical, Rotella, Tresca, and Oliveras have provided sworn financial disclosure statements (Financial Statements) to the United States and the Commonwealth and the United States and the Commonwealth have relied on the accuracy and completeness of those

9

Financial Statements in reaching this Agreement. Nichole Medical, Rotella, Tresca, and Oliveras warrant that their respective Financial Statements are complete, accurate, and current. In the event the United States or the Commonwealth learn of asset(s) in which Nichole Medical, Rotella, Tresca, or Oliveras had an interest at the time of this Agreement that were not disclosed in the Financial Statements, or in the event the United States or the Commonwealth learn of any misrepresentation by Nichole Medical, Rotella, Tresca, or Oliveras on, or in connection with, their respective Financial Statements, and in the event such nondisclosure or misrepresentation changes the estimated net worth set forth on their respective Financial Statements by $75,000 or more, the United States or the Commonwealth may at their option with respect to the breaching party or parties: (a) rescind this Agreement and reinstate its suit based on the Covered Conduct; or (b) let the Agreement stand and collect the full Settlement Amount plus one hundred percent (100%) of the value of the net worth previously undisclosed. Nichole Medical, Rotella, Tresca, and Oliveras agree not to contest any collection action undertaken by the United States or the Commonwealth pursuant to this provision.

12.    In the event that the United States or the Commonwealth, pursuant to Paragraph 11, above, opts to rescind this Agreement, Nichole Medical, Rotella, Tresca, and Oliveras agree not to plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims which (1) are filed by the United States or the Commonwealth within 45 calendar days of written notification to Nichole Medical, Rotella, Tresca, and Oliveras that this Agreement has been rescinded, and (2) relate to the Covered Conduct, except to the extent these defenses were available on March 3, 2003 (the date on which the plaintiffs' complaint was filed).

10

13.     Nichole Medical, Rotella, Tresca, and Oliveras waive and will not assert any defenses Nichole Medical, Rotella, Tresca, and Oliveras may have to any criminal prosecution or administrative action relating to the Covered Conduct, which defenses may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this Paragraph or any other provision of this Agreement constitutes an agreement by the United States or the Commonwealth concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

14.     Nichole Medical, Rotella, Tresca, and Oliveras fully and finally release the United States and the Commonwealth, their agencies, employees, servants, and agents from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) which Nichole Medical, Rotella, Tresca, and Oliveras have asserted, could have asserted, or may assert in the future against the United States, the Commonwealth, their agencies, employees, servants, and agents, related to the Covered Conduct and the United States' and the Commonwealth's investigation and prosecution thereof.

15.     The Settlement Amount will not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare carrier or intermediary or any State payer, related to the Covered Conduct; and Nichole Medical and Rotella agree not to resubmit to any Medicare carrier or intermediary or any State payer any previously denied claims related to the Covered Conduct, and agree not to appeal any such denials of claims.

16.     Nichole Medical and Rotella  agree to the following:

11

(a)     <u>Unallowable Costs Defined:</u> that all costs (as defined in the Federal Acquisition Regulations (FAR) 48 C.F.R. § 31.205-47 and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg and 1396-1396v, and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Nichole Medical, its present or former officers, directors, employees, shareholders, and agents or Rotella in connection with the following shall be "unallowable costs":

(1) the matters covered by this Agreement,

(2) the United States' and the Commonwealth's audit(s) and civil and any criminal investigation(s) of the matters covered by this Agreement,

(3) Nichole Medical's investigation, defense, and corrective actions undertaken in response to the United States' and the Commonwealth's audit(s) and civil and any criminal investigation(s) in connection with the matters covered by this Agreement (including attorney's fees),

(4) the negotiation and performance of this Agreement,

(5) the payments Nichole Medical makes to the United States pursuant to this Agreement, including any costs and attorneys fees, and

(6) the negotiation of, and obligations undertaken pursuant to the IA to:

(i) Retain an independent review organization to perform annual reviews as described in Section III of the IA; and

(ii) prepare and submit reports to the OIG-HHS,

are unallowable costs on Government contracts and under the Medicare Program, Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program (FEHBP).

12

(b)     <u>Future Treatment of Unallowable Costs:</u>  These unallowable costs will be separately determined and accounted for by Nichole Medical, and Nichole Medical will not charge such unallowable costs directly or indirectly to any contracts with the United States or any State Medicaid Program, or seek payment for such unallowable costs through any cost report, cost statement, information statement, or payment request submitted by Nichole Medical or any of its subsidiaries to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

(c)     <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>: Nichole Medical further agrees that within 90 days of the effective date of this Agreement it will identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid, VA and FEHBP fiscal agents, any unallowable costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid Program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Nichole Medical or any of its subsidiaries or affiliates, and will request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs.  Nichole Medical agrees that the United States, at a minimum, will be entitled to recoup from Nichole Medical any overpayment plus applicable interest and penalties as a result of the inclusion of such unallowable costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice, and/or the affected agencies.  The United States reserves its rights to disagree with any calculations submitted by Nichole Medical

13

or any of its subsidiaries on the effect of inclusion of unallowable costs (as defined in this Paragraph) on Nichole Medical or any of its subsidiaries' cost reports, cost statements, or information reports. Nothing in this Agreement shall constitute a waiver of the rights of the United States to examine or reexamine the unallowable costs described in this Paragraph.

17.     This Agreement is intended to be for the benefit of the Parties, only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 18 below.

18.     Nichole Medical and Rotella agree that they waive and will not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

19.     Nichole Medical and Rotella warrant that they have reviewed their financial situation and that they currently are solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and will remain solvent following their payment to the United States of the Settlement Amount. Further, the Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants, and obligations set forth constitute a contemporaneous exchange for new value given to Nichole Medical and Rotella, within the meaning of 11 U.S.C. § 547(c)(1); and (b) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended and do, in fact, represent a reasonably equivalent exchange of value which is not intended to

hinder, delay, or defraud any entity to which Nichole Medical or Rotella was or became

indebted, on or after the date of this transfer, all within the meaning of 11 U.S.C. § 548(a)(1).

20.    If, within 91 days of any payment under this Agreement, Nichole Medical or

Rotella commences, or a third party commences, any case, proceeding, or other action under any

law relating to bankruptcy, insolvency, reorganization, or relief of debtors, (a) seeking to have

any order for relief of Nichole Medical's or Rotella's debts, or seeking to adjudicate Nichole

Medical or Rotella as bankrupt or insolvent; or (b) seeking appointment of a receiver, trustee,

custodian, or other similar official for Nichole Medical or Rotella or for all or any substantial

part of Nichole Medical's or Rotella's assets, Nichole Medical and Rotella agree as follows:

a.    Nichole Medical's and Rotella's obligations under this Agreement may not

be avoided pursuant to 11 U.S.C. §§ 547 or 548, and neither Nichole Medical nor Rotella will

argue or otherwise take the position in any such case, proceeding, or action that: (i) Nichole

Medical's or Rotella's obligations under this Agreement may be avoided under 11 U.S.C. §§ 547

or 548; (ii) Nichole Medical or Rotella was insolvent at the time this Agreement was entered

into, or became insolvent as a result of the payment made to the United States hereunder; or (iii)

the mutual promises, covenants, and obligations set forth in this Agreement do not constitute a

contemporaneous exchange for new value given to Nichole Medical or Rotella.

b.    If Nichole Medical's or Rotella's obligations under this Agreement are

avoided for any reason, including, but not limited to, through the exercise of a trustee's

avoidance powers under the Bankruptcy Code, the United States and the Commonwealth, at their

sole option, may rescind the releases in this Agreement, and bring any civil and/or administrative

claim, action, or proceeding against Nichole Medical and Rotella for the claims that would

15

otherwise be covered by the releases provided in Paragraphs III(5)-III(7), above. Nichole Medical and Rotella agree that (i) any such claims, actions, or proceedings brought by the United States and the Commonwealth (including any proceedings to exclude Nichole Medical and Rotella from participation in Medicare, Medicaid, or other Federal health care programs) are not subject to an "automatic stay" pursuant to 11 U.S.C. Section 362(a) as a result of the action, case, or proceeding described in the first clause of this Paragraph, and that Nichole Medical and Rotella will not argue or otherwise contend that the United States' and the Commonwealth's claims, actions, or proceedings are subject to an automatic stay; (ii) Nichole Medical and Rotella will not plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any such civil or administrative claims, actions, or proceeding which are brought by the United States or the Commonwealth within 45 calendar days of written notification to Nichole Medical or Rotella that the releases herein have been rescinded pursuant to this Paragraph, except to the extent such defenses were available on March 3, 2003; and (iii) the United States and the Commonwealth have valid claims against Nichole Medical and Rotella in the amount of $750,000, and the United States and the Commonwealth may pursue their claims in the case, action, or proceeding referenced in the first clause of this Paragraph, as well as in any other case, action, or proceeding.

      c.     Nichole Medical and Rotella acknowledge that their agreements in this Paragraph are provided in exchange for valuable consideration provided in this Agreement.

      21. (a) In the event that any defendant fails to pay any amount as provided in paragraphs III(1) or III(16) within five (5) business days of the date upon which such payment is due, that defendant shall be in Default of its payment obligations ("Default"). The United States

or the Commonwealth will provide written notice of the Default, and that defendant shall have an opportunity to cure such Default within five (5) business days from the date of receipt of the notice.  Notice of Default will be delivered to that defendant's counsel or to such other representative as that Defendant shall designate in advance in writing.  If Defendant fails to cure the Default within five (5) business days of receiving the Notice of Default, the United States or the Commonwealth shall notify any defendant who is jointly and severally liable for the obligation.  Such additional defendant shall have five (5) business days from the date of receipt of the notice of default to advise the United States or Commonwealth that it intends to cure the default and that it will do so within an additional 5 days.

If such additional defendant cures the default, then the original obligation and plan shall be reinstated.  Otherwise, the remaining unpaid balance of the Settlement Amount shall become immediately due and payable by all defendants jointly and severally liable, and interest shall accrue at the rate of 12% per annum compounded daily from the date of Default on the remaining unpaid total (principal and interest balance).  Any jointly and severally liable defendant shall consent to a Consent Judgment in the amount of the unpaid balance, and the United States and the Commonwealth, at their joint option, may: (a) offset the remaining unpaid balance from any amounts due and owing to defendant by any department, agency, or agent of the United States or Commonwealth at the time of the Default; or (b) exercise any other rights granted by law or in equity, including the option of referring such matters for private collection. Defendants agree not to contest any offset imposed and not to contest any collection action undertaken by the United States or the Commonwealth pursuant to this Paragraph, either administratively or in any state or federal court.  Defendants shall pay the United States and the

Commonwealth all reasonable costs of collection and enforcement under this Paragraph, including reasonable attorney's fees and expenses.

       (b)    Any uncured default under this paragraph constitutes a material breach of this agreement.

       (c)    In the event of Default as defined in Paragraph 21(a), above, OIG-HHS may exclude Nichole Medical and Rotella from participating in all Federal health care programs until Nichole Medical and Rotella pay the Settlement Amount and reasonable costs as set forth in Paragraph II.1.a, above.  Such exclusion shall have national effect and shall also apply to all other federal procurement and nonprocurement programs.  Federal health care programs shall not pay anyone for items or services, including administrative and management services, furnished, ordered, or prescribed by Nichole Medical or Rotella in any capacity while Nichole Medical or Rotella is/are excluded.  This payment prohibition applies to Nichole Medical, Rotella, anyone who employs or contracts with Nichole Medical or Rotella, any hospital or other provider where Nichole Medical or Rotella  provides services, and anyone else.  The exclusion applies regardless of who submits the claims or other request for payment.  Nichole Medical and Rotella shall not submit or cause to be submitted to any Federal health care program any claim or request for payment for items or services, including administrative and management services, furnished, ordered, or prescribed by Nichole Medical and/or Rotella during the exclusion.  Violation of the conditions of the exclusion may result in criminal prosecution, the imposition of civil monetary penalties and assessments, and an additional period of exclusion.  Nichole Medical and Rotella further agree to hold the Federal health care programs, and all federal beneficiaries and/or sponsors, harmless from any financial responsibility for items or services

18

furnished, ordered, or prescribed to such beneficiaries or sponsors after the effective date of the exclusion. Nichole Medical and Rotella waive any further notice of the exclusion and agree not to contest such exclusion either administratively or in any state or federal court. Reinstatement to program participation is not automatic. If at the end of the period of exclusion Nichole Medical or Rotella wishes to apply for reinstatement, Nichole Medical and/or Rotella must submit a written request for reinstatement in accordance with the provisions of 42 C.F.R. §§ 1001.3001-.3005. Neither Nichole Medical nor Rotella will be reinstated unless and until OIG-HHS approves such request for reinstatement.

22. Upon receipt of all of the payments described in Paragraph III(1) above, the United States and the Commonwealth shall promptly sign and file a Joint Stipulation of Dismissal with prejudice of the Civil Action pursuant to the terms of the Agreement.

23. Each Party to this Agreement will bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

24. Nichole Medical, Rotella, Tresca, and Oliveras represent that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

25. This Agreement is governed by the laws of the United States. The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement will be the United States District Court for the Eastern District of Pennsylvania, except that disputes arising under the IA shall be resolved exclusively under the dispute resolution provisions in the IA.

19

26.    This Agreement and the IA, which is incorporated herein by reference, constitute the complete agreement between the Parties.  This Agreement may not be amended except by written consent of the Parties, except that only the signatories to the IA must agree in writing to a modification of the IA.

27.    The individuals signing this Agreement on behalf of Nichole Medical represent and warrant that they are authorized by Nichole Medical to execute this Agreement. The United States signatories represent that they are signing this Agreement in their official capacities and that they are authorized to execute this Agreement.  The Commonwealth's signatories represent that they are signing this Agreement in their official capacities and that they are authorized to execute this Agreement.

28.    This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

29.    This Agreement is binding on Nichole Medical, Rotella, Tresca, and Oliveras's successors, transferrees, heirs, and assigns.

30.  All parties consent to the United States' and the Commonwealth's disclosure of this Agreement, and information about this Agreement, to the public.

31.     This Agreement is effective on the date of signature of the last signatory
to the Agreement.  Facsimiles of signatures shall constitute acceptable, binding signatures for
purposes of this Agreement.

PATRICK L. MEEHAN
United States Attorney

VIRGINIA A. GIBSON  *MXH*
Chief, Civil Division

Dated: January 27th, 2006

PAUL G. SHAPIRO
Assistant United States Attorney


THOMAS W. CORBETT, JR.
Attorney General of the Commonwealth of
Pennsylvania

Dated: January _____, 2006

ELIZABETH M. DILLOWAY CLEEK
Senior Deputy Attorney General


DATED:_____          BY: _ _____

LEWIS MORRIS
Chief Counsel to the Inspector General
Office of Inspector General
United States Department of
  Health and Human Services

21

**31.**    This Agreement is effective on the date of signature of the last signatory

to the Agreement. Facsimiles of signatures shall constitute acceptable, binding signatures for

purposes of this Agreement.

                                  PATRICK L. MEEHAN
                                  United States Attorney


                                  _____
                                  VIRGINIA A. GIBSON
                                  Chief, Civil Division

Dated: January-_____, 2006

                                  _____
                                  PAUL G. SHAPIRO
                                  Assistant United States Attorney


                                  _____
                                  THOMAS W. CORBETT, JR.
                                  Attorney General of the Commonwealth of
                                  Pennsylvania

Dated: January 26, 2006           Elizabeth M. Dilloway Clerk
                                  ELIZABETH M. DILLOWAY CLEEK
                                  Senior Deputy Attorney General


DATED:_____           BY: _ _____
                                  LEWIS MORRIS
                                  Chief Counsel to the Inspector General
                                  Office of Inspector General
                                  United States Department of
                                  Health and Human Services

21

NICHOLE MEDICAL AND EQUIPMENT SUPPLY, INC

DATED: 1/26/06      BY: _____, President

DATED: 1/26/06      _____
                    DOMINIC P. ROTELLA

DATED: _____.     _____
                    WILLIAM TRESCA

DATED: _____.     _____
                    LORRAINE OLIVERAS

22

NICHOLE MEDICAL AND EQUIPMENT SUPPLY, INC

DATED:_____    BY:_____

DATED:_____    _____
                  DOMINIC P. ROTELLA

DATED: 1/26/06    _____
                  WILLIAM TRESCA

DATED:_____    _____
                  LORRAINE OLIVERAS

22

NICHOLE MEDICAL AND EQUIPMENT SUPPLY, INC

DATED:_____    BY:_____ ___

DATED:_____    _____
                     DOMINIC F. ROTELLA

DATED:_____    _____
                     WILLIAM TRESCA

DATED: /-22-06       _____
                     LORRAINE OLIVERAS

22

# EXHIBIT B
## TO
## Amended Complaint

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD

**DECISION OF MEDICARE APPEALS COUNCIL**

| **In the case of** | **Claim for** |
|---|---|
| Nichole Medical Equipment & Supply, Inc. | Supplementary Medical Insurance Benefits (Part B) |
| (Appellant) | |
| Anderson Ames and 38 others (see attached) | 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A and 38 others (see attached) |
| (Beneficiary) | (HIC Number) |
| TriCenturian | 1-5104726 |
| (Contractor) | (ALJ Appeal Number) |

By notice dated April 12, 2007, the Medicare Appeals Council advised the appellant that it had decided, on its own motion, to review the Administrative Law Judge's (ALJ's) decision dated February 12, 2007. *See* 20 C.F.R. §§ 404.967 and 404.970, *incorporated by reference in* 42 C.F.R. § 405.856.

The Council has carefully considered the record that was before the ALJ, as well as the memorandum, with any attachments, from the Centers for Medicare & Medicaid Services (CMS) dated March 29, 2007. The Council enters the following into the record:

Exh. MAC-1: CMS Referral Memorandum and attachments
Exh. MAC-2: Council's Notice of Review
Exh. MAC-3: Letter from Appellant's representative, dated May 17, 2007
Exh. MAC-4: Letter from Appellant's representative, dated July 17, 2007
Exh. MAC-5: Letter from Appellant's representative, dated July 31, 2007
Exh. MAC-6: Council letter to Appellant's representative, dated August 3, 2007
Exh. MAC-7: Referral from U.S. Rep. Schwartz, dated September 24, 2007

The Council hereby reviews the ALJ's decision because there is
an error of law, and issues a decision that is fully favorable
to the appellant.

## BACKGROUND AND PROCEDURAL HISTORY

The appellant is a supplier of durable medical equipment (DME).
The Medicare Program Safeguard Contractor (PSC), TriCenturion,
issued a notice of overpayment to the appellant by letter dated
June 29, 2004.  Exh. 16.  The letter informed the appellant that
the PSC had conducted a review of randomly-selected claims filed
by the appellant for motorized wheelchairs (K0011) and semi-
electric hospital beds (E0260) supplied to sixty beneficiaries
(thirty for each piece of equipment).  The PSC determined that
the items supplied to forty-eight of the sixty beneficiaries did
not meet Medicare reimbursement criteria.  It extrapolated the
denials to the universes of wheelchair and hospital bed claims
submitted by the appellant from January 1, 2000 to June 30,
2001, and determined that the supplier was overpaid in the
amount of $428,374.54 for those items during that period.  In
addition, the PSC assessed $36,301.18 in actual overpayments
determined on claims outside the sampling period.

The appellant submitted several rebuttal statements (Exh. 19-21)
in response to the notice of overpayment.  The contractor
revised its overpayment determination on the extrapolated amount
to $399,786.26 and on the actual overpayment to $28,671.74.
Exh. 24.  The appellant then requested a fair hearing.

The DME regional carrier hearing officer reviewed the case and
issued a decision on June 22, 2005.  Exh. 27.  The hearing
officer affirmed the PSC's denials on the individual claims in
the samples.  She did not address any other facets of the
overpayment or the claims reopened outside the sample period.

The appellant requested an ALJ hearing.  While the appellant's
request for hearing stated that the "amount allegedly remaining
in controversy is $428,458," the appellant's representative also
indicated that it was attaching the carrier hearing officer's
summary data sheets "for each decision we are appealing."  Exh.
28 at 2.  Those data sheets concern only the cases in the
samples and not the claims that were used to calculate the
extrapolated overpayment.

The ALJ held a series of pre-hearing conferences and a two-day
hearing.  Dec. at 4-5; Exh. P15-P63.  In his subsequent

decision, the ALJ issued findings concerning the items in each
individual sample claim that was still at issue.  He concluded
that claims for two wheelchairs and fifteen beds could be paid.
He also found that "to enforce the results of the extrapolation
is unreasonable" because written notice was not given to the
appellant that any claims were to be reopened, there was no new
evidence to justify the reopening, and "the contractor failed to
describe adequately the constitution of the two universes which
would have afforded the opportunity in this decision to
recalculate the projected overpayment."  Dec. at. 26-27.

CMS referred the ALJ's decision to the Council for its review.
Exh. MAC-1.  The agency asserted that the ALJ erred by
"nullifying an overpayment extrapolation on the basis of
perceived procedural and documentary deficiencies on the part of
the [PSC]."  Exh. MAC-1 at 1.  CMS also asserted that the ALJ's
decision that seventeen out of the thirty-nine claims in the
case meet the coverage criteria was not supported by the
evidence in the record.  *Id.* at 6.

Given that the carrier hearing officer and ALJ addressed only
the claims in the two samples, those claims and the extrapolated
overpayment are the only claims before the Council.  After
reviewing the record, the Council finds that the agency, through
its contractor, did not properly reopen the claims at issue in
this case, for the reasons set forth below.

## LEGAL AUTHORITIES

Pursuant to Medicare regulations, a carrier initial or review
determination, or hearing officer decision, may be reopened
under the following circumstances:

> (a) Within 12 months from the date of the notice of
> such initial or review determination or decision to
> the party to such determination or decision; or

> (b) After such 12-month period, but within 4 years
> from the date of the notice of the initial
> determination to the party to such determination, upon
> establishment of good cause for reopening such
> determination or decision (See 20 C.F.R. § 404.988(b)
> and 404.989); or

    (c) At any time, when:

        (1) Such initial determination or review
        determination or decision was procured by
        fraud or similar fault of the beneficiary or
        some other person, or

        (2) Such initial or review determination or
        decision is unfavorable, in whole or in
        part, to the party thereto, but only for the
        purpose of correcting a clerical error or
        error on the face of the evidence on which
        such determination or decision is based.

42 C.F.R. § 405.841. Further, when a Medicare payment
determination or decision is reopened, "notice of such reopening
shall be mailed to the parties to such determination or decision
at their last known addresses." 42 C.F.R. § 405.842(a). In
addition, any revision of the payment determination following a
reopening "shall be mailed to the parties and shall state the
basis for the revised determination or decision." *Id.*
Referenced 20 C.F.R. § 404.989(a)(1) provides that there is
"good cause" to reopen a determination or decision if "[n]ew and
material evidence is furnished." *See also* Medicare Claims
Processing Manual (MCPM) (Pub. 100-04), ch. 34, § 10.11 (eff.
Nov. 29, 2006).

In reviewing the PSC's actions and interpreting the regulations,
the Council looks to the Medicare manuals that were in effect at
the time of the PSC's site visit in May, 2002, which was the
appellant's first notice that it was being audited. The
Medicare Carriers Manual (MCM) (Rev. 1721) section 12100.9(A)
states that, for the purpose of reopening, "new and material"
evidence "[i]ncludes any evidence which was not considered when
the previous determination or decision was made and which shows
facts not available and that may result in a conclusion
different from that reached in the determination or decision."
This definition has not changed in CMS's more recent
publications. *See* MCPM ch. 34, § 10.11.1 (eff. Nov. 29, 2006).[1]

The MCM further provides that "[t]he decision to conduct a
sample study of a physician's or supplier's claims constitutes a

---

[1] Manuals issued by CMS may be accessed on the CMS website at
http://www.cms.hhs.gov/manuals.

reopening of all determinations in the population from which the
sample is drawn, but only when such a decision is documented and
is clearly intended to question the correctness of all such
determinations."  MCM § 12100.7.

### EVALUATION OF THE EVIDENCE

The agency asserts that the ALJ erred in finding that the PSC
did not have a basis for reopening the initial determinations,
and did not properly reopen.  CMS argues that, "[t]his case
involves a fraud investigation conducted by a PSC" and that "the
applicable provision for the reopening is 405.841 (c), which
allows for reopenings 'at any time' if the initial determination
'was procured by fraud or similar fault.'"  Exh. MAC-1 at 1, 5.
Moreover, "to the extent that [section] 405.842 applies to an
on-site fraud investigation, the letter delivered by the PSC
fulfills the notice requirements."  *Id.* at 5.  Even if the
circumstances surrounding the audit did not reveal that fraud or
similar fault was involved, "information related to the ongoing
fraud investigation and known by the PSC would also satisfy the
requirement that a contractor have new and material evidence to
reopen claims more than a year from the initial determination
date."  *Id.*

The chronology of the contractor's actions leading up to the
notice of overpayment was unclear until CMS included, with the
agency's referral memorandum to the Council, a copy of the
TriCenturion's description of its actions, dated March 28, 2007.
Exh. MAC-1 at 12-13.  According to that chronology, the
appellant had been under investigation for several years by the
series of contractors that had jurisdiction over the appellant's
geographic region, as well as the Office of the Inspector
General (OIG).  In both 2001 and 2004, the case was returned to
the administrative contractor by OIG because the Assistant U.S.
Attorney declined to pursue a fraud case against the appellant.

In the meantime, the contractor conducted an unannounced on-site
audit of the appellant's records, on May 20, 2002.  The exact
date of that site visit had also been unknown until CMS attached
a copy of the letter received and signed by the appellant at the
site visit. Exh. MAC-1 at 9-10.  This letter was not previously
submitted for inclusion in the record in this case by either the
appellant or the contractor.  It states that the "claims being
reviewed are for services pertaining to **Motorized Wheelchairs
(K0011) and Semi-Electric Hospital Beds (E0260)**."  Exh. MAC-1 at
9 (emphasis in original).  It also lists the documents that the

PSC required as part of the audit.  Finally, it states:  "We are requesting this information in order to determine whether payments made were appropriate or to ensure that claims under review are appropriately paid."  Exh. MAC-1 at 10.

While the agency argues that this letter, delivered in the course of an "on-site fraud investigation," fulfills the notice requirements of 42 C.F.R. § 405.842(a), the Council disagrees. When this case became one of administrative overpayment rather than alleged fraud, CMS was required to follow the binding regulations of 42 C.F.R. § 405.842(a), and provide a notice of reopening, which would include a list of the claims being reopened and the reason for the reopening.

The Council finds that the letter from TriCenturion dated May 20, 2002, cannot be construed as a notice of reopening under the regulations, and neither the PSC nor CMS has submitted other contemporaneous documents that could be construed as a determination of reopening.

There is nothing in the record, the referral memorandum, or the chronology provided by the PSC that refers to any other written communication by the PSC or the agency to the appellant concerning this matter until the notice of overpayment was sent on June 29, 2004.  The notice of overpayment indicated that the postpayment review had occurred, "because our analysis of your billing data showed that you **might** be billing inappropriately for motorized wheelchairs (K0011) and semi-electric hospital beds (E0260)."  Exh. 16 at 3 (emphasis added).  According to the record, this is the first written notice that the appellant received concerning the claims at issue and the reason for the postpayment review.  This letter also does not allege fraud or similar fault; therefore, the Council does not find substantiation for the CMS's assertion that the agency could reopen the claims at any time under 42 C.F.R. § 405.841(c).

Since the June 29, 2004, letter is the first notice of reopening that the contractor issued, some of the initial determinations reopened are more than four years prior to that date.  Because there is no evidence of fraud or similar fault in this case, those claims were not subject to reopening.  (The Council agrees with the ALJ that the date on the Medicare Remittance Notices reflect the date of initial determination, in the absence of other information.)

For claims reopened between one and four years after the date of
the initial determination, the agency must establish good cause
for reopening.  42 C.F.R. § 405.841(b).  While CMS alleges that
"information . . . known by the PSC" would satisfy the "new and
material evidence" requirement for good cause, such information
is not in the record and CMS has not submitted it to the
Council.  In its referral memorandum, CMS asserts that the ALJ
"did not provide the opportunity for the PSC to submit
documentation or participate in the proceedings. . . .  The PSC
had no way of knowing that the judge was challenging the audit
leading up to the claim and overpayment decision."  Exh. MAC-1
at 4.  However, the ALJ's decision states that CMS declined the
opportunity to participate as a party.  Dec. at 5.  The record
indicates that CMS was invited to appear at the fourth pre-
hearing conference and declined.  Exh. P43.[1]  Neither CMS nor the
PSC appeared or requested to appear at the two hearing dates.
Moreover, all documents concerning the overpayment process
should have been entered into the record by the PSC, and neither
the PSC nor CMS have submitted to the Council any additional
documentation concerning the audit process other than the
exhibits listed above.  Therefore, the Council finds no new and
material evidence to support reopening of the initial
determinations under 42 C.F.R. § 405.841.

The ALJ similarly decided that the initial determinations on
these claims were improperly reopened.  Dec. at 26-27.  However,
he then issued findings concerning the individual claims in the
samples.  *Id.*  This was an error of law.  If the initial
determinations were improperly reopened, then any revised
determination would also be improper on those claims.
Therefore, the initial determinations stand.

---

[1] The record indicates that, prior to the fourth pre-hearing conference, CMS
was also asked by the ALJ to brief the issues of the sampling methodology and
whether the ALJ should follow the U.S. District Court's decision in <u>Maximum
Comfort v. Thompson</u>.  Exh. P24.  CMS submitted a brief to the ALJ on those
issues, and a follow-up letter.  Exh. P31, P35. On April 18, 2005, the ALJ
ordered CMS to submit its brief to the Court of Appeals in that case.  Exh.
P39.  On April 28, 2005, the ALJ issued its notice of the fourth pre-hearing
conference, inviting CMS for the first time.  Exh. P40.  The notice did not
indicate what particular issues would be discussed.  However, the Council
considers this notice sufficient opportunity for CMS to determine what issues
the ALJ would consider in the hearing and in his decision.

**DECISION**

It is the decision of the Medicare Appeals Council that CMS and the contractor did not properly reopen the initial determinations in the claims at issue, pursuant to the applicable regulations.  Therefore, the sample claims remain paid as initially determined.

MEDICARE APPEALS COUNCIL

M. Susan Wiley
Administrative Appeals Judge

Gilde Morrisson
Administrative Appeals Judge

Date:   JAN 3 1 2008

Medicare Appeals Council
Nichole Medical Equipment Supply, Inc
Appeal Number 1-5104726
Claims

| CLI Count | Claim # | Total Original Amount | HIC # | Bene. Last Name | Bene. First Name |
|---|---|---|---|---|---|
| 1 | 1 | $4,493.64 | 198076361A | AMES | ANDERSON |
| 1 | 2 | $4,496.82 | 230071740A | BONNEY | ERNEST |
| 1 | 3 | $4,430.82 | 228182635D | BROWN | GEORGIE |
| 1 | 4 | $4,440.79 | 155187086A | FARRINGTON | LOUISE |
| 1 | 5 | $4,261.58 | 197017044A | FLYNN | ROBERT |
| 1 | 6 | $4,496.82 | 170343996A | GIBSON | CAROLYN |
| 1 | 7 | $4,477.83 | 249386728D | HALLUMS | MARY |
| 1 | 8 | $3,804.88 | 249520027A | LADSON | ARCHIE |
| 1 | 9 | $4,422.79 | 247364264A | LAWHORNE | JOSEPH |
| 1 | 10 | $4,512.36 | 180149509A | LEE | MARY |
| 1 | 11 | $4,453.77 | MA186128965 | MARSH | CLEMENTINE |
| 1 | 12 | $4,525.44 | 156187335A | MORTON | EMMA |
| 1 | 13 | $4,410.71 | 182248852M | NELSON | PEGGY |
| 1 | 14 | $4,440.79 | 169128762D | PALARDY | EDITH |
| 1 | 15 | $4,473.15 | 266445428M | PATRICK | WILLIE |
| 1 | 16 | $4,430.82 | 196426201A | ROBINSON | DAPHNE |
| 1 | 17 | $4,477.83 | 165121952D6 | ROPER | ANN |
| 1 | 18 | $4,496.82 | 176034128D | SCOTT | QUINTINE |
| **Total Wheelchairs** | | **$79,547.66** | | | |
| 1 | 19 | $4,493.66 | 212125343D | TYLER | NELLIE |
| 2 | 20 | $256.28 | 161181642C1 | BORGER | MINNIE |
| 2 | 21 | $690.36 | 141162539A | CLEARY | JOSEPH |
| 2 | 22 | $674.35 | 243643589A | CRUDUP | THADDEUS |
| 2 | 23 | $384.96 | 157183302A | DUBOW | LILLIAN |
| 1 | 24 | $96.39 | 229441574B | FELTON | BESSIE |
| 2 | 25 | $256.28 | 164261239A | GILHAM | CARROLL |
| 3 | 26 | $481.19 | 163038558A | HAFFT | WILLIAM |
| 2 | 27 | $224.80 | 165169342M | HENDRICKS | ANNA |
| 2 | 28 | $1,538.78 | 155030676C1 | HOBBS | WILLIAM |

Nichole Medical Equipment Supply, Inc.
Appeal Number 1-5104726
Claims

| CLI Count | Claim # | Total Original Amount | HIC # | Bene. Last Name | Bene. First Name |
|---|---|---|---|---|---|
| 1 | 29 | $1,442.68 | 190169165A | JENIFER | ERNEST |
| 1 | 30 | $1,074.96 | 198289447A | KERR | CHARLES |
| 1 | 31 | $1,058.57 | 159307859A | LEO | EDWARD |
| 1 | 32 | $913.42 | 185011137A | LIPSCHUTZ | SONYA |
| 1 | 33 | $384.80 | 260360792A | LITTLE | HORACE |
| 1 | 34 | $1,171.06 | 244309779M | LOVE | NATHANIEL |
| 2 | 35 | $257.04 | 245563725B | BUSSEY | IDA |
| 1 | 36 | $448.86 | 146148194A | TOMASCO | CLARA |
| 1 | 37 | $1,378.78 | 169345534A | WILSON | CHARLES |
| 1 | 38 | $1,341.79 | 184172928A | SHAPIRO | RUTH |
| 1 | 39 | $384.80 | 228055927A | MOORE | COLUMBUS |
| Total Beds | | $18,953.81 | | | |

Nichole Medical Equipment Supply, Inc.
Appeal Number 1-5104726
Remittance Notice Dates

| Claim No. | Exhibit No.* | Amount | Remittance Date |
|---|---|---|---|
| 32 | 20 | $96.10 | 5/16/2000 |
| 32 | 21 | $181.66 | 4/7/2000 |
| 32 | 22 | $181.66 | 3/10/2000 |
| 32 | 23 | $101.66 | 2/9/2000 |
| 33 | 14 | $128.14 | Jun-00 |
| 33 | 15 | $128.52 | 6/20/2001 |
| 33 | 16 | $128.14 | 1/3/2001 |
| 34 | 14 | $96.39 | 6/29/2001 |
| 34 | 15 | $29.39 | 5/24/2001 |
| 34 | 16 | $96.39 | 4/27/2001 |
| 34 | 17 | $96.39 | 3/27/2001 |
| 34 | 18 | $96.39 | 2/27/2001 |
| 34 | 19 | $16.39 | 1/29/2001 |
| 34 | 20 | $96.10 | 12/27/2000 |
| 34 | 21 | $96.10 | Nov-00 |
| 34 | 22 | $96.10 | Oct-00 |
| 34 | 23 | $128.14 | 9/27/2000 |
| 34 | 24 | $128.14 | Aug-00 |
| 34 | 25 | $156.37 | Jul-00 |
| 35 | | $225.00 | No Notice |
| 35 | | $225.00 | No Notice |
| 36 | 18 | $128.52 | 6/12/2001 |
| 36 | 19 | $128.14 | Oct-00 |
| 36 | 20 | $96.10 | May-00 |
| 36 | 21 | $96.10 | 5/9/2000 |
| 37 | 12 | $96.39 | 6/14/2001 |
| 37 | 13 | $96.39 | 5/8/2001 |
| 37 | 14 | $96.39 | 3/9/2001 |
| 37 | 15 | $16.39 | 2/7/2001 |
| 37 | 16 | $96.10 | 1/9/2001 |
| 37 | 17 | $128.14 | May-00 |
| 37 | 18 | $48.14 | Mar-00 |
| 37 | 19 | $96.10 | Nov-00 |
| 37 | 20 | $96.10 | Oct-00 |
| 37 | 21 | $96.10 | Sep-00 |
| 37 | 22 | $96.10 | Aug-00 |
| 37 | 23 | $96.10 | Jul-00 |
| 37 | 24 | $96.10 | Jun-00 |
| 37 | 25 | $128.14 | Apr-00 |
| 38 | 14 | $96.39 | 6/15/2001 |
| 38 | 15 | $96.39 | 5/17/2001 |
| 38 | 16 | $96.39 | 4/17/2001 |
| 38 | 17 | $96.39 | 3/16/2001 |
| 38 | 18 | $128.52 | 2/16/2001 |
| 38 | 19 | $128.14 | 1/17/2001 |
| 39 | 11 | $143.39 | Dec-01 |
| 39 | 12 | $143.39 | 6/5/2000 |
| 39 | 13 | $143.82 | 6/5/2001 |

Attachment 3

* Exhibit No. refers to exhhibits
in individual claim folders

# EXHIBIT C
## TO
## Amended Complaint



**Department of Health and Human Services**
**OFFICE OF MEDICARE HEARINGS AND APPEALS**
**Mid-Atlantic Region**
**Arlington, Virginia**

| | | | |
|---|---|---|---|
| Appeal of: | **Nichole Medical Equipment & Supply, Inc.** | Appeal No: | **1-5104726** |
| | | | **Medicare Part B** |
| Beneficiary: | **Multiple** | Before: | **Philip Baten** |
| HICN: | **Multiple** | | **U.S. Administrative Law Judge** |

# DECISION

After careful consideration of the evidence and arguments presented in the record, a
**PARTIALLY FAVORABLE** decision is entered for the appellant on 39 claims for motorized
wheelchairs and electrical beds which were provided to various beneficiaries. (*See Attachment
1*). In addition, these 39 claims represented a sample of 467 claims which comprised the statisti-
cal universe against which appellant was assessed an extrapolated overpayment of $485,374.54.
For reasons which are explained in this decision, the statistical sampling process (not the meth-
odology) which resulted in the extrapolated overpayment amount is *nullius juris*.

## Legal Framework

**I.    ALJ Review Authority**

*A. Jurisdiction*

An appellant who is dissatisfied with the reconsideration of an initial determination is en-
titled to a hearing before the Secretary of the Department of Health and Human Services (HHS),

provided the amount in controversy is sufficient and a request for hearing is filed in a timely manner. *See* 42 U.S.C. § 1395ff(b)(1)(A).

In implementing this statutory directive, the Secretary has delegated his authority to administer the nationwide hearings and appeals system for the Medicare program to the Office of Medicare Hearings and Appeals (OMHA). *See* 70 Fed. Reg. 36386, 36387 (June 23, 2005). The administrative law judges (ALJs) within OMHA issue the final decisions of the Secretary, except for decisions that are reviewed by the Medicare Appeals Council. *Id.*

A hearing before an ALJ is only available if the remaining amount in controversy is $110 or more. *See* 42 U.S.C. § 1395ff(b)(1)(E). The request for hearing is timely if it is filed within 60 days after receipt of a reconsideration decision. *See* 42 C.F.R. § 405.1002(a); *see also* 20 C.F.R. §404.933(b)(1).

### B. Scope of Review

Under the Centers for Medicare and Medicaid Services' (CMS) implementation policy for the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA), Pub. Law 106-554, app. F, 114 Stat. 2763, 2763A-463, and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), Pub. Law 108-173, 117 Stat. 2066, all initial determinations dated after January 1, 2006 are governed by the ALJ hearing procedures set forth at 42 C.F.R. §§ 405.1000 through 405.1054. *See* 70 Fed. Reg. 11420, 11424-26 (Mar. 8, 2005). All initial determinations dated *prior to* January 1, 2006 are governed by the ALJ hearing procedures set forth at 20 C.F.R. §§ 404.929 through 404.961. *Id.*

The issues before the ALJ include all the issues brought out in the initial determination, redetermination or reconsideration that were not decided entirely in the appellant's favor. How-

Case 2:10-cv-00389-CMR   Document 1   Filed 01/28/2010   Page 32 of 64
Case 1:12-cv-00364-EGB   Document 6   Filed 08/09/12   Page 53 of 80

Appeal No.   1-5104726

ever, if evidence presented before or during the hearing causes the ALJ to question a favorable portion of the determination, he or she will notify the appellant and may consider it an issue at the hearing. *See* 42 C.F.R. §405.1032; *see also* 20 C.F.R. § 404.946(a).

The administrative law judge may decide a case on the record and not conduct an oral hearing if the decision is fully favorable, or if the appellant indicates in writing that he does not wish to appear before the ALJ at a hearing. *See* 42 C.F.R. §405.1038; *see also* 20 C.F.R. § 404.948(b)(i).

### C. Standard of Review

"The [Office of Medicare Hearings and Appeals]...is staff[ed] with Administrative Law Judges who conduct 'de novo' hearings...." 70 Fed. Reg. 36386 (June 23, 2005); *see also In re Atlantic Anesthesia Associates, P.C.*, MAC (June 2004): "An ALJ qualified and appointed pursuant to the Administrative Procedure Act acts as an independent finder of fact in conducting a hearing pursuant to section 1869 of the Act. This [sic] requires *de novo* consideration of the facts and law."

## II.   Principles of Law

### A. Statutes and Regulations

The Medicare Part A program entitles a beneficiary to have payment made to him or on his behalf for medical and other health services. *See* §1812 of the Act. The Medicare Part B program entitles a beneficiary to have payment made to him or her on his or her behalf for medical and other health services. *See* §1832(a)(1) of the Social Security Act; *see also* 42 C.F.R. § 410.3(a)(1). Coverage of medical and other health services is qualified by the overarching principles of §§ 1862(a) and 1833(e) of the Act. Section 1862(a) limits Medicare payments

Case 1:10-cv-00389-LMB   Document 1   Filed 01/28/2010   Page 33 of 64
Case 1:12-cv-00364-EGB   Document 6   Filed 08/09/12   Page 56 of 80

Appeal No.  1-5104726

under Part A and Part B to items or services that are "reasonable and necessary for the diagnosis

or treatment of illness or injury or to improve the functioning of a malformed body member,"

notwithstanding any other provision of Title XVIII of the Act.  *See also* 42 C.F.R.

§ 411.15(k)(1).  Section 1833(e) of the Act requires a claim for payment under Medicare Part B

to be supported by sufficient information and documentation. *See also* 42 C.F.R. § 424.5(a)(6).

### *B. Policy and Guidance*

Section 1871(a)(2) of the Act states that unless promulgated as a regulation by CMS, no

rule, requirement, or statement of policy, other than a National Coverage Determination (NCD),

can establish or change a substantive legal standard governing the scope of benefits or payment

for services under the Medicare program.  *See also* 42 C.F.R. § 405.860.  However, in lieu of

binding regulations with the full force and effect of law, CMS and its contractors have issued

policy guidance that establishes criteria for coverage of selected types of medical items and

services in the form of manuals and local medical review policies ("LMRPs") or local coverage

determinations ("LCDs").

### Procedural History

This matter is presented on appeal from a joint unfavorable contractor decision which

was issued on June 22, 2005 denying 39 claims to include purchases of 19 motorized wheel-

chairs and 20 hospital bed rentals which were provided to certain Medicare beneficiaries.  Appel-

lant filed a timely notice of appeal for an administrative law judge (ALJ) hearing.  A telephone

pre-hearing conference was held on November 2, 2005.  Attorney Martin Pezzner represented

the appellant at the conference.  Appellant also attended the conference in the person of the

owner of the company. A second pre-hearing telephone conference was held on November 10, 2005. Mr. Pezzner again represented the appellant, and the appellant was present. On January 13, 2006, appellant presented a brief arguing that the certificates of medical necessity (CNM) were all that was required to make a claim under the rules then extant, that certain claims should not be part of the statistical sample, and that the statistical process was flawed. On January 27, 2006, an order issued which requested CMS to respond to the brief. Eventually, CMS submitted a response on March 2006, after having requested multiple extensions of time. The brief addressed the CMN issue, and the issue of the exclusion of certain claims from the statistical sample, but it did not address the sampling process issue. The validity of the sampling methodology was not challenged in this appeal.

On April 28, 2006 an order was issued to appellant to file a rebuttal if it wished to do so. However, appellant fired Mr. Pezzner as of May 2, 2006. Appellant then asked to have until August 10, 2006 to retain new counsel. On August 3, 2006, a pre-hearing telephone conference was held with the new Attorney, Robert Szwajkos, and the appellant. Mr. Szwajkos adopted all the outstanding issues and briefs which were presented earlier by appellant. At this point CMS was offered an opportunity to participate as a party in this matter and declined to do so. On October 12, 2006, the first in-person hearing was held. Mr. Szwajkos represented appellant, and presented appellant as a witness. Appellant was duly sworn. Time did not permit the conclusion of this hearing. On December 14, 2006, the final session of the in-person hearing was held. Mr. Szwajkos presented additional exhibits for the record which were accepted. This decision follows.

### Issues

The general issue for appeal is whether payment may be made under Part B of Title XVIII of the Social Security Act ("the Act") for the services, or whether the services are excluded from coverage under Section 1862(a)(1)(A) of the Act and the applicable Medicare regulations, because the services were not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

If the services are found to be excluded from coverage under Section 1862(a)(1)(A), then the second issue to be determined is whether payment may nevertheless be made to appellant under the waiver of liability provisions of Section 1879(a) of the Act (42 U.S.C. § 1395pp(a)), because neither the appellant nor the beneficiaries knew, and could not reasonably have been expected to know, that payment would not be made under Part B for the services.

Since this case involves statistical sampling, an additional issue arises as to whether the statistical sampling process complied with Medicare regulations. This decision makes no finding with regard to the validity of the sampling methodology.

### Findings and Analysis

Presented on appeal are 39 claims which comprise 19 motorized wheelchair sales and 20 hospital bed rentals which were denied reimbursement by the contractor in the amount of $98,501.47. This decision made a favorable ruling on 2 wheelchairs and 15 beds. The remainder of the claims were decided unfavorably. These 39 claims were random samples which were culled from two statistical universes (frames) of 467 claims. Against these frames, the contractor applied a statistical methodology to achieve the extrapolated overpayment amount of

$485,374.54. This decision will discuss each individual claim and then proceed to discuss the statistical sampling process which resulted in the extrapolated overpayment demand.

Under Part B of the Social Security Act (the Act) Medicare will reimburse for motorized wheelchairs and hospital beds as durable medical equipment (DME) when they comport with §1861(n) of the Act and are medically reasonable and necessary under §1862(a) of the Act for the particular beneficiary.   The regional Medicare contractors have also issued local policy guidelines which spell out in detail the criteria which must be satisfied to meet the medically rea-sonable and necessary requirement.  With regard to these claims, the contractor policy which was then extant required that a physician must complete a certificate of medical necessity (CMN) which the provider of the DME must maintain on file.  In addition, the policy required the physi-cian to maintain the supporting medical records.  However, this requirement was not imposed on the supplier of the DME. *See generally DMERC Supplier's Manual, Exh. 3, in Main Case File #1.* At all times pertinent, the appellant did maintain the CMN on the claims, but not any addi-tional medical records.

Sometime after these claims were paid, the contractor decided to reopen the claims.  The contractor randomly selected 39 claims from a universe of 467 claims.  For the 39 claims, the contractor sought additional medical documentation from the appellant and ultimately, from the physicians.  In addition, the contractor conducted interviews with some of these beneficiaries. As a result of this review, these 39 claims were declared overpayments and recoupment of $98,501.47 was demanded from appellant.  These claims comprised part of the statistical formula involving 467 claims which resulted in an extrapolated overpayment of $485,374.54.  The con-tractor also demanded recoupment of this amount.  On appeal before the contractor, the appellant

argued that the regulations and the statute required only the CMN for payment.  The contractor

ruled that the CMNs on filed for the 39 claims were valid, however supporting medical docu-

mentation was also required.  The contractor also determined after all the evidence was collected

and reviewed during the reopening, that the evidence was insufficient to show medical necessity.

In many instances, the record did contain other documentation which the contractor had obtained

during the reopening review.  The contractor cited these documents to deny some of the claims.

As a defense to the contractor's redetermination, and in this present appeal, the appellant

argued that the CMN which they had on file is all that is required for proof of medical necessity

and payment.  Also, they have no obligation to maintain additional medical records to satisfy any

review by the contractor.  And therefore, any information which is obtained during a subsequent

reopening process may not be used to negate medical necessity of claims which were legiti-

mately paid on the CMN.  To support this proposition further, appellant cites *Maximum Comfort,*

*Inc., v. Thompson,* 323 F.Supp.2d. 1060 (E.D.Ca 2004) in its brief.  *See generally Exh. P21,*

*Pleading Folder 1.  Maximum Comfort* primarily adopts the position that Congress under §

1814(j)(2) of the Act mandated that only CMNs may be required to support claims for DME.

However, at least one federal circuit has declined to follow *Maximum Comfort.  See Gulfcoast*

*Medical Supply, Inc. v. Secretary, Dept. of Health and Human Services,* 468 F.3d 1347 (11th Cir.

2006).  As appellant is Pennsylvania which is part of the Third Circuit, *Gulfcoast Medical Supply*

does not bind this decision.

However, this decision declines to enter the debate as to whether CMNs are all that may

be required under the Medicare statutes or regulations to prove the medical necessity of a claim.

The local policy at issue required that at least the physician should maintain additional documen-

Case 2:10-cv-00389-JMS    Document 1    Filed 01/28/2010    Page 38 of 64
Case 1:12-cv-00364-EGB    Document 6    Filed 08/09/12    Page 61 of 80

Appeal No.   1-5104726

tation to support the supplier's request for reimbursement. *Exh. 3, p. 3.* This requirement is sufficient to put the supplier on notice that circumstances may arise in which additional documentation may be required. If the physician did fail to maintain and present such records on demand by a contractor, the supplier should reasonably expect that his claim would be in jeopardy. The contractor in these claims did receive some additional documentation from the physicians and interviewed some of the beneficiaries during the reopening review. This documentation is now part of the record of this case. The appellant for the purposes of this appeal also obtained additional documents to support the claims. These documents are also part of the record.

This decision has resolved to review the entire record to decide these claims. Without deciding whether the contractor collected the reopening documentation improperly or "illegally", suffice it to say that the Medicare rules do not contemplate the exclusion of improperly obtained evidence in the fashion of the Constitutional exclusion of evidence in criminal proceedings. When the evidence comes into the record by whatever means, it may be considered. As a mere observation, the local policy does make its position clear that additional documentation may be requested. Without deciding, a fair argument can be made that the contractor committed no regulatory violations when it sought additional documentation from whatever source possible. At this point, we proceed to the merits of the 39 claims.

A. Motorized Wheelchairs

Motorized wheelchairs are covered by Medicare under §1861(n) of the Act when the medical necessity criteria of §1862(a) is met. The local policies of the contractor outline these criteria as follows:

A power wheelchair is covered when all of the following criteria are met:

1)   The patient's condition is such that without the use of a wheelchair the patient would otherwise be bed or chair confined, and;

2)   The patient's condition is such that a wheelchair is medically necessary and the patient is unable to operate a wheelchair manually and;

3)   The patient is capable of safely operating the controls for the power wheelchair.

*Exh. 27, p. 5, Main Folder #3.*  In addition, § 1861(n) requires that the device is necessary for use in the home. This decision reviews these claims accordingly.

Claim #1:  The date of service for this claim is August 31, 2000.  In a November 6, 2004, letter to the contractor, the beneficiary said that he does not need the chair.  He only received it on a trial basis and has not used it since it was left at the house. *Exh. 9* [*]  Further, the beneficiary stated on September 17, 2002 that he could operate a manual wheelchair. *Exh. 8.*  On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid.**

Claim #2:  The date of service for this claim is March 20, 2001.  In response to a questionnaire from the contractor, the beneficiary stated on February 14, 2002 that he does not use the chair in the home and instead uses a cane and walker. *Exh. 5.*  On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item.  For these reasons, this claim is **not paid.**

---

[*] All exhibit numbers within the claims refer to the individual claim folders.

**Claim #3:** The date of service for this claim is October 13, 2000. In response to a questionnaire from the contractor on May 26, 2002, the beneficiary stated that she can walk 2 to 3 blocks for exercise and uses the chair 2 hours in the morning and 2 hours in the evening. *Exh. 6.* On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid.**

**Claim #4:** The date of service for this claim is January 5, 2000. In a questionnaire on January 29, 2002, the beneficiary stated that she uses it for shopping and getting around the halls. She is only in the chair for 1 hour per day. However, she says that she cannot walk. *Exh. 4.* Her physician in a letter which was dated January 11, 2000 stated that he prescribed a walker for her. *Exh. 7.* On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid.**

**Claim #5:** The date of service for this claim is March 30, 2000. The medical records which were available at the time of service state that the beneficiary had chronic heart failure. *Exh. 6, p. 5.* This document is dated December 13, 2001. Another medical note which is dated January 5, 2000, says that the beneficiary's "mobility is relatively restricted as he walks with a cane". *Exh. H4, Tab 5, p. 5-5, Hearing Folder H4.* On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid.**

**Claim #6:** The date of service for this claim is May 22, 2001. In a questionnaire on April 29, 2002, the beneficiary stated that he cannot walk, but he can operate a manual wheelchair. *Exh. 6.* On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid.**

**Claim #7:** The date of service on this claim is January 23, 2001. In an interview conducted on May 21, 2002, the beneficiary said that he can use a walker for 10-15 feet when not using the chair. *Exh. 5.* On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid.**

**Claim #8:** The date of service on this claim is February 9, 2001. In a questionnaire on January 2, 2002, the beneficiary stated that he can walk from his chair to the bathroom, that his heart condition has gotten worse and that he would not be able to maintain his independence without the chair. *Exh. 5.* Only the CMN suggests that he cannot ambulate in the home to care for his daily needs or operate a manual wheelchair. On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid.**

**Claim #9:** The date of service for this claim is December 2000. The CMN is the only relevant document available in the file and shows a diagnosis of rheumatoid arthritis. *Exh. 9.* This diagnosis of itself does not suggest the need for a motorized wheelchair without more information. On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons this claim is **not paid.**

**Claim #10:** The date of service for this claim is May 26, 2000. The only relevant document in this file is the CMN which shows the diagnoses of rheumatoid arthritis, swelling of limbs and spinal cord injury. Although further documentation is not available, the diagnosis of spinal cord injury does suggest that this beneficiary may not be able to ambulate, especially with the additional complications of rheumatoid arthritis. On these facts, a fair inference is made that

the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is paid.

Claim #11: The date of service for this claim is June 20, 2000. The only relevant document in this file is the CMN. *Exh. 6.* None of the diagnoses listed on the CMN suggests that the beneficiary was unable to ambulate in the home. A medical note does state that the beneficiary wishes to have a motorized wheelchair and that she is chair confined. *Exh. 7, p. 3.* The note does not say that she cannot operate a manual wheelchair. On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is not paid.

Claim #12: The date of service for this claim is March 10, 2001. An office note says that the beneficiary has pain in both feet and is unable to walk and needs an electric wheelchair. *Exh. 11.* In a questionnaire from the contractor, the beneficiary stated that he cannot operate a manual chair, and uses his chair for home and community room. *Exh. 7.* On these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is paid.

Claim #13: The date of service for this claim is September 7, 2000. In a questionnaire on September 18, 2002, the beneficiary stated that he does not use the chair, and that he could walk at the time that he had received the chair. For ambulation in the home he uses a cane. *Exh. 5.* On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is not paid.

Claim # 14: The date of service for this claim is August 2000. In a questionnaire from the contractor, the beneficiary stated that she uses a manual wheelchair in the home and uses the

13 of 28

Case 2:11-cv-00389-(JMS)-EBB Document 1 Filed 01/28/2010 Page 43 of 84
Case 1:12-cv-00964-EGB Document 1 Filed 03/29/12 Page 66 of 80

Appeal No. 1-5104726

motorized chair outside the home. *Exh. 7*. On these facts, a fair inference is made that the bene-

ficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not**

**paid.**

Claim #15: The date of service for this claim is December 2000. The CMN is signed by

one doctor on December 12, 2000. *Exh. 8*. However, a letter from someone else who purports to

be the physician for the beneficiary is dated March 13, 2002 and states that he last saw the bene-

ficiary on February 19, 2001, and that he did not need a wheelchair. *Exh. 8*. On these facts, a

fair inference is made that the beneficiary's condition did not meet the criteria for this item. For

these reasons, this claim is **not paid.**

Claim #16: The date of service for this claim is August 29, 2000. The beneficiary an-

swered a questionnaire from the contractor on September 17, 2002 stating that, at the time that he

received the chair, he could walk with a walker and could also operate a manual wheelchair.

*Exh. 5*. On these facts, a fair inference is made that the beneficiary's condition did not meet the

criteria for this item. For these reasons, this claim is **not paid.**

Claim #17: The date of service for this claim is February 8, 2001. The file contains a

hospital report which cites that the beneficiary has moderately advanced osteoarthritis in both

knees. *Exh. 7, p. 12*. Only the CMN suggests that the beneficiary cannot ambulate within the

home or operate a manual wheelchair. On these facts, a fair inference is made that the benefici-

ary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid.**

Claim #18: The date of service for this claim is June 18, 2001. An office note from the

doctor on July 20, 2000 states that the beneficiary is frustrated because she can only walk about

one block and wants a motorized chair. *Exh. 9*. In answering a questionnaire from the contractor

on January 3, 2002, the beneficiary stated that it was her doctor's idea to get the chair and that she can walk about a block. *Exh. 7.* On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid**.

Claim #19:  The date of service for this claim is October 2, 2000. The only relevant document in the file is the CMN. None of the diagnoses on the CMN suggests that the beneficiary cannot ambulate in the home. *Exh. 6.* On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid.**

### B. Hospital Beds

Semi-electric beds are covered by Medicare under §1861(n) of the Act when the medical necessity criteria of §1862(a) is met. The local policy defines the medical necessity criteria as follows:

> A semi-electric bed is covered if indications 1 and/or 2, 3, or 4 are met and indication 5 is met:
>
> 1. A patient who requires positioning of the body in ways not feasible with an ordinary bed due to a medical condition which is expected to last at least one month. Elevation of the head/upper body less than 30 degrees does not usually require use of a hospital bed.
>
> 2. A patient who requires, for the alleviation of pain, positioning of the body in ways not feasible with an ordinary bed.
>
> 3. A patient who requires the head of the bed to be elevated more than 30 degrees most of the time due to congestive heart failure, chronic pulmonary disease, or problems with aspiration. Pillows or wedges must have been considered.

4.   A patient who requires traction equipment which can only be
attached to a hospital bed.

5.   The patient requires frequent changes in body position and/or
has an immediate need for a change in body position.

Region A DMERC Supplier Manual, Chapter 14 (Rev. 5, 12/97).  Appellant provided these beds

to various beneficiaries on a monthly rental basis.

Claim #20:  The date of service for this claim is June 20, 2000.  The CMN is dated

March 16, 1998 without citing a diagnosis.  *Exh. 10.*  However, some clinical notes which are

dated December 8, 1998, indicate that the beneficiary should never be in a supine position or on

the sacrum until the wound heals.  *Exh. 11.*  The record is not clear if 1998 has any relation to

2000.  The bed was not picked up from the beneficiary until February 21, 2002.  *Exh. 7.*  No

documentation appears to relate to the beneficiary's needs in June 2000.  On these facts, a fair in-

ference is made that the beneficiary's condition did not meet the criteria for this item.  For these

reasons, this claim is **not paid.**

Claim #21:  The date of service for this claim is November 29, 2000-May 29, 2001.  A

prescription for the bed was written on December 19, 2000.  The CMN was written on Novem-

ber 21, 2000 citing diagnoses as rheumatoid arthritis, asthma and schizophrenia.  In a question-

naire from the contractor, the beneficiary stated that he needed the bed for arthritis pain.  The al-

leviation of pain, when frequent repositioning is required, meets the criteria for the bed.  On

these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this

item.  For these reasons, this claim is **paid.**

Claim #22:  The date of service for this claim is December 27, 2000-May 27, 2001.  The

CMN which is dated December 12, 2000, cites the diagnoses of rheumatoid arthritis and gout.

*Exh. 7.* The prescription is signed by the doctor and dated December 19, 2000 and only specifies a motorized bed. *Exh. 8.* No other documents elaborate on the need for the bed. However, the diagnosis of rheumatoid arthritis suggests that the beneficiary was suffering from pain which required frequent repositioning. The alleviation of pain, when frequent repositioning is required, meets the criteria for the bed. On these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid**.

**Claim #23:** The date of service for this claim is January 20, 2000-April 20, 2001. Medical evaluation notes on February 10, 2000 state that the beneficiary has hyperlipidemia and movement disorder. *Exh. 12.* However, the CMN which is dated January 20, 2000 states that the reason for the bed is aspiration. *Exh. 10.* Further, the Medicare claim forms which are bills for the bed cite the diagnosis of rheumatoid arthritis. *Exhs. 4, 5, 6, 7, and 8.* On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid**.

**Claim #24:** The date of service for this claim is February 10, 2001-February 27, 2001. A medical evaluation note which is dated July 11, 2000 states that the beneficiary had end-stage arthritis in both knees, and knee replacement. *Exh. 7, p. 8.* In response to a questionnaire from the contractor, the beneficiary stated that she needed the bed because of the knee replacement. *Exh. 6.* The record has no CMN on file. These facts suggest that the beneficiary had a slow recovery from the knee replacement in 2000 and therefore required the bed. The alleviation of pain, when frequent repositioning is required, meets the criteria for the bed. On these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid**.

**Claim #25:** The date of service for this claim is June 24, 2000-December 25, 2000. The record contains no CMN. The beneficiary stated in a questionnaire from the contractor on December 24, 2001 that she did not need a hospital bed. On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid**.

**Claim #26:** The date of service for this claim is May 23, 2000-June 4, 2001. A discharge summary which is dated on March 14, 2000 cited the diagnoses as congestive heart failure and ambulation dysfunction. *Exh. 11, p. 7.* Congestive heart failure is a diagnosis which suggests a need for the bed. On these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid**.

**Claim #27:** The date of service for this claim is March 1, 2000-March 1, 2001. The CMN in the file is dated December 31, 1997 and cites no diagnosis. *Exh. 5.* However, the claim forms which were submitted for payment show a diagnosis of rheumatoid arthritis and incontinence. *Exh. 4.* However, a prescription which was dated December 5, 2006, stated that in 2000 the bed was necessary because of fracture of the right leg. *Exh. H4, Tab 27, p. 27-5 (Hearing Folder H4).* These contradictions as to the diagnosis create a fair inference that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid**.

**Claim #28:** The date of service for this claim is February 25, 2000-April 25, 2001. The CMN is dated February 19, 2000 and does not state a diagnosis. *Exh. 21.* However, the Medicare claim form states a pertinent diagnosis of emphysema and heart failure. *Exh. 20.* Aspiration and heart failure are two qualifying diagnoses for a bed. On these facts, a fair inference is

made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid**.

Claim #29: The date of service for this claim is February 28, 2000-April 28, 2001. The CMN is dated February 23, 2000, without any listed diagnosis. *Exh. 21*. The diagnoses which are listed on the Medicare claim forms are lack of coordination, hypertension and diabetes. *Exh. 20*. The record does not suggest a correlation between the diagnoses and the need for the bed. On these facts, a fair inference is made that the beneficiary's condition did not meet the criteria for this item. For these reasons, this claim is **not paid**.

Claim #30: The date of service for this claim is August 16, 2000-June 16, 2001. A medical evaluation on July 17, 1999 cited a diagnosis of chronic schizophrenia and asthma. *Exh. 8*. An earlier evaluation also included COPD. *Exh. 8, p. 5*. The CMN cited bronchitis and asthma as relevant diagnoses. *Exh. 7*. The questionnaire from the contractor, which the beneficiary completed on September 17, 2002, cited difficulty breathing, asthma and emphysema as reasons for the bed. These diagnoses are qualifying reasons for the bed. On these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid**.

Claim #31: The date of service for this claim is August 22, 2000-May 22, 2001. The CMN in this record is dated August 17, 2000 and cites a diagnosis of rheumatoid arthritis. *Exh. 6*. This diagnosis is a qualifying diagnosis for the bed. On these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid**.

**Claim #32:** The date of service of this claim is January 27, 2000-May 27, 2001. The CMN is dated July 27, 2000 and cites terminal heart disease as the diagnosis. *Exh. 7.* The claim form for Medicare billing cites chronic airway obstruction and heart disease. Overall, these diagnoses would support having a bed. On these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid.**

**Claim #33:** The date of service for this claim is June 7, 2000-June 7, 2001. The CMN on file is dated June 7, 1995 citing a diagnosis of acute pulmonary heart disease. *Exh. 6.* A fair assumption is that the beneficiary has had the bed since 1995. The Medicare claim form shows a new diagnosis of osteoarthritis. *Exh. 5, p. 2.* On these facts a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid.**

**Claim #34:** The date of service of this claim is July 14, 2000-June 14, 2001. The CMN is dated July 6, 2000 citing a diagnosis of osteoarthritis and amputation. On these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid.**

**Claim #35:** The date of service for this claim is April 4, 2001-May 4, 2001. The CMN is dated April 3, 2001 and cites the diagnosis of cerebrovascular accident. *Exh. 10.* In a questionnaire from the contractor, the beneficiary stated that she needed the traction devices on the bed. On these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid.**

**Claim #36:** The date of service for this claim is January 30, 2000-May 30, 2001. The CMN is dated April 23, 1999 and cites no diagnosis. *Exh. 11.* However, the Medicare claim forms cite the diagnoses as osteoarthritis, skin ulcers, heart failure and back disorder. *Exh. 10,*

*pp. 1-4.* On these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid.**

**Claim #37:** The date of service for this claim is February 25, 2000-April 2001. The CMN is dated February 16, 2000 and cites a qualifying diagnosis of rheumatoid arthritis. On these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid.**

**Claim #38:** The date of service for this claim is December 1, 2000-June 4, 2001. The CMN is dated December 4, 2000 and cites the qualifying diagnoses of rheumatoid arthritis and fractured pelvis. *Exh. 7.* These diagnoses are supported in the operative report which is dated November 20, 2000. *Exh. 8, p. 4.* On these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid.**

**Claim # 39:** The date of service for this claim is May 23, 2000-May 23, 2001. No CMN is on file. However, the Medicare claim forms cite the qualifying diagnoses of osteoarthritis and amputation. *Exh. 4.* The operative medical reports explain that the amputation was below the knee. *Exh. 5, p. 15.* On these facts, a fair inference is made that the beneficiary's condition did meet the criteria for this item. For these reasons, this claim is **paid.**

### C. The Statistical Sampling Process

Now that the merits of the 39 claims have been decided, we turn to the statistical sampling process. The authority to perform statistical sampling stems from HCFA Ruling 86-1 (Feb. 20, 1986) and its predecessor policies. This ruling was tested in the courts and was upheld, permitting the government to use statistical sampling to avoid the individual examination of a large

volume of claims. Based on the sampling, an overpayment amount may be extrapolated. *See generally Chaves County Home Health Service, Inc., et al. v. Louis W. Sullivan, MD*, 931 F.2d 914,923 (D.C. Cur. 1991).

This decision declares that the extrapolated overpayment, which resulted from the statistical sampling process in this case, is *nullius juris*, not because the statistical methodology was flawed or invalid but because the process, which the regulations require the government to follow, were not followed, thereby denying the appellant the benefit of the law and regulations. In addition, this decision declines to uphold the statistical extrapolation because the contractor failed to explain fully the methodology that was applied, and therefore this decision cannot meet its responsibility to recalculate a new extrapolated amount.

First, we begin with the regulatory violations to justify the nullification of the extrapolated overpayment amount. The contractor failed to comply with significant regulations when it began its reopening of the appellant's claims. The first regulation, which was ignored, provides in pertinent part:

> (a) Notice: When any determination or decision is reopened as provided in § 405.841, notice of such reopening shall be mailed to the parties to such determination or decision at their last known addresses …

42 CFR. § 405.842. Appellant testified that he did not receive written notice that any claims were being reopened. The first that he knew of anything was the day when his office was invaded and his files were searched, which by his testimony occurred April, May or June of 2001 or April, May or June of 2002. For reasons to be explained later, this decision finds that the in-

vasion of the office occurred in June of 2002.  Giving proper notice is important because it sets

the time frame for the operation of 42 C.F.R. § 405.841, which states the following:

> An initial or review determination [payment] of a carrier or a deci-
> sion of a hearing officer may be reopened by such carrier or hear-
> ing officer:
>
> (a) Within 12 months from the date of the notice of such initial or
> review determination or decision to the party to such determination
> or decision: or
>
> (b) After such 12-month period, but within 4 years from the date of
> the notice of the initial determination to the party to such determi-
> nation, upon establishment of good cause for reopening such de-
> termination or decision (see 20 CFR § 404.988(b) and § 404.989);

42 CFR § 405.841.  The notice requirement triggers the interconnection between the two provi-

sions.  For example, if appellant were notified of the opening on January 1, 2002, then the con-

tractor would be permitted to reopen any claim that was initially determined within 12 months of

that date without any reason.  However, if the claim goes beyond 12 months of that date, then the

contractor must have before it *new and material evidence* to justify the reopening as spelled out

in 20 CFR § 404.989.  Medicare Claims Processing Manual, Pub. 100-4, Chapter 34 further de-

fines new evidence.  It provides in pertinent part:

> New and material evidence includes any evidence which was not
> considered when the previous determination or decision was made
> and which shows *facts not available* [emphasis added] and that
> may result in a conclusion different from that reached in the de-
> termination or decision. Thus, the submittal of any additional evi-
> dence is not a basis for reopening. The information must be "new,"
> i.e., not readily available or known to exist at the time of the initial
> determination.

*Medicare Claims Processing Manual*, Pub. 100-4, Ch. 34 §10.11.

The record in this case makes no clear showing as to when each of the 39 claims were initially determined. However, most of the claims files did contain the Medicare Remittance Notices which are issued along with the payment checks. For the purposes of this appeal, this decision finds it reasonable to construe the dates on these remittance notices to be the initial determination dates, as the record is devoid of any other information. The state of the record as provided by CMS permits no other approach to divine the initial determination dates for each of the claims.

Assuming without deciding that the date of the invasion of the office was the operative "notice" date in this case, then we look to the June 2002 period to determine the time frame of the claims with respect to the 12-month period. As stated earlier, this decision finds that the raid occurred in June 2002. Based on the dates of the remittance notices, Claims 6, 8 and a one-month rental period in Claims 21 and 22 fall within the 12-month period of notice. For these claims, this decision finds that the contractor was not required to show new evidence on hand to justify the reopening. However, the remaining claims fall outside the 12-month period (except for claims which had no remittance notices on file which are: Claims 2, 4, 11, 12, 13, 15, 16, 17, 19, and 35). [*For more detail refer to Attachment 3*]. The remaining claims come under the operation of §405.841(b), and therefore the contractor is required to have on hand new evidence to justify the reopening of the claims. The record shows that the contractor had no such new evidence on hand at the time of the "notice".

The contractor's overpayment letter, which was dated June 29, 2004, and the only correspondence which appellant had received from up to this point, advised appellant of the results of the reopening. It states the reasons for the reopening as follows:

24 of 28

> This review [reopening] was conducted because our analysis of
> your billing data showed that you might be billing inappropriately
> for motorized wheelchairs (K0011) and semi-electric hospital beds
> (E0260).

*Exh. 17, Main Case File #2.* The letter does not mention any new evidence which might have

been on hand to justify the reopening of claims which are more than 12 months beyond the "no-

tice" of reopening. The "billing data", which was analyzed, was always before the contractor to

review at its leisure. Unfortunately they waited too long to make their review. The policy man-

ual which was cited earlier specifically defines "new" as information which is not readily avail-

able or known to exist at the time of the initial determination. And, since no notice was ever is-

sued, no further analysis can be made to determine which claims fall within the operative time

frames. The best that we can do is to guess the initial determination dates, and guessing is unac-

ceptable in any adjudicatory process.

Second, we examine the explanation in the letter with regard to the statistical methodol-

ogy of the sampling process to justify the application of *nullius juris* to the results because the

explanation does not afford an opportunity to recalculate the overpayment amount that was ex-

trapolated. In the June 29, 2004 overpayment demand letter, the contractor undertook to de-

scribe the statistical methodology:

> We surveyed 60 beneficiaries (two "samples"), randomly selected
> from a total of 467 (two "universes"). We successfully inter-
> viewed 26 beneficiaries or caregivers and requested 60 sets of
> medical records of which we received and reviewed 36. We re-
> viewed 60 of your beneficiary records.
>
> We reviewed claims for 60 randomly selected beneficiaries. Our
> review revealed that services for 48 beneficiaries did not meet
> Medicare reimbursement criteria as defined by applicable policy,

Case 2:10-cv-00389-CMR   Document 1   Filed 01/28/2010   Page 55 of 64
Case 1:12-cv-00364-ECB   Document 6   Filed 08/09/12   Page 78 of 80

Appeal No.   1-5104726

were not ordered by a physician, and/or did not have the required
supporting documentation.

*Exh. 17, Main Case File #2.* The letter goes on say that the review period covered services dated

January 1, 2000 to May 27, 2002. Also, the record of the 39 claims does not show any dates of

service beyond June 2002. For this reason, as stated earlier, this decision finds that the invasion

of the appellant's office occurred in June 2002 which is, as best can be construed, the "notice"

date.

The letter is not clear on the method used to relate these figures to the two universes to

obtain the extrapolated overpayment amount of $485,374.54. These 39 claims consist of 19 mo-

torized wheelchairs and 20 beds. The total amount for all 19 wheelchairs is $84,041.32. The to-

tal rental for all 20 beds is $14,460.15. *[See Attachment 2]*. Of these numbers, this decision paid

10.5% of the wheelchairs and 75% of the beds. Before any attempt can be made to adjust the ex-

trapolation, given the percentages which are paid, the record must reveal what number of the 467

claims in the two universes was beds and/or wheelchairs. Without this knowledge, a proper ad-

justment on the overpayment cannot be made. Unfortunately, the record makes no such revela-

tions.

Given all the problems with this case, this decision holds that upholding the results of the

statistical sampling is not reasonable. First, written notice was not given to the appellant that any

claims were to be reopened. Second, being forced to construe as the notice date from the date of

the raid on appellant's office is injudicious at best. However doing so renders the notice date as,

June 2002. Further, comparing this date to the Medicare Remittance Notices as the initial deter-

minations dates also demonstrates the failure of the contractor to explain the universe. By this

26 of 28

Case 2:10-cv-00369-CMR    Document 1    Filed 01/28/2010    Page 56 of 64
Case 1:12-cv-00364-EGB   Document 6   Filed 08/09/12   Page 79 of 80

Appeal No.  1-5104726

reckoning, all but 2 of the wheelchairs and one month each of the bed rentals in Claims 21 and 22, are outside the 12-month period.  In this regard, the regulations required the contractor to demonstrate new evidence on hand to justify the reopening.  No such new evidence was demonstrated in the record.  Third, 9 of the wheelchair files and 1 of the bed files had no remittance notices or any other document from which initial determination dates may be reasonably surmised.  Therefore, these claims must be construed against the contractor as requiring new evidence on hand to reopen.  Fourth, the contractor failed to describe adequately the constitution of the two universes which would have afforded the opportunity in this decision to recalculate the projected overpayment.  For all of these reasons, this decision holds that to enforce the results of the extrapolation is unreasonable and further holds that those results are *nullius juris*.

## Limitation of Liability

Section 1879 of the Act provides that when neither the beneficiary nor the provider knew or had reason to know that Medicare would not cover the services, then Medicare will pay.  The provision continues that if the provider knew or had reason to know that Medicare would not pay for the services, but the beneficiaries did not know or have reason to know, then Medicare will indemnify the beneficiaries and seek overpayment from the provider.

On the facts of the claims which were denied in this appeal the beneficiaries could not have known that Medicare would not cover the services.  First, they signed no Advance Beneficiary Notice (ABN) which serves to inform a beneficiary before services are provided that Medicare may not pay for the services.  Second, no evidence indicates that the beneficiaries had knowledge of or understood the complexities of the local contractor polices.  However, it is rea-

Appeal No.   1-5104726

sonable to impute such knowledge to a provider who is charged with apprising himself of Medicare rules and guidelines.  Therefore, this decision holds that the beneficiaries are not liable for these services and are entitled to indemnification under the Act if necessary. [*See* Section 1879(b)].

### Conclusions of Law

Some of the DME which were provided to the beneficiaries were reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, as required by Section 1862(a)(1) of the Act and complied with the standards of § 1861(n) of the Act.  Therefore, payment may be made under Part B of Title XVIII of the Act on those claims which were paid herein.

### Order

The Medicare Contractor is **DIRECTED** to process payment in accord with this decision, to wit: 1) refund to appellant so much of the funds which represent the amount of the extrapolated overpayment which resulted from statistical sampling process, and 2) pay the appellant on the 39 sample claims in accord with the Payment Sheet, Attachment 1..

### SO ORDERED

Dated:  February 12, 2007

Philip C. Baten
U.S. Administrative Law Judge

Enclosures:    Attachment 1, Payment Sheet
Attachment 2, Claims
Attachment 3, Remittance Notice Dates

28 of 28