# In the United States Court of Federal Claims

No. 12-364C

(Filed: February 25, 2013)

* * * * * * * * * * * * * * * * * * * * * * *

NICHOLE MEDICAL EQUIPMENT & SUPPLY, INC. and DOMINIC ROTELLA,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*.

* * * * * * * * * * * * * * * * * * * * * * *

Medicare equipment supplier; settlement agreement; warranty; covenant of good faith and fair dealing; motion to dismiss.

*David M. Hollar*, Conshohocken, PA, for plaintiffs.

*Jeremiah M. Luongo,* United States Department of Justice, Commercial Litigation Branch, Washington, DC, with whom was *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Steven J. Gillingham*, Assistant Director, for defendant.

## OPINION

BRUGGINK, Judge.

On January 27, 2006, Nichole Medical Equipment & Supply, Inc. ("Nichole Medical") and its owner Mr. Dominic Rotella (collectively, "plaintiffs") entered into a settlement agreement with the United States and the Commonwealth of Pennsylvania. Plaintiffs agreed to pay the United States $750,000 to resolve allegations that they were liable for violations of the False Claims Act,[1] fraud, and unjust enrichment, all arising out of asserted improper Medicare and Medicaid reimbursement claims. Plaintiffs now contend that the United States breached that agreement. Pending is defendant's motion to

---

[1]*See* 31 U.S.C. §§ 3729-3733 (2006) *amended by* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621 (2009).

dismiss for failure to state a claim upon which relief may be granted. We held oral argument on January 3, 2013. The matter is fully briefed. For the reasons set forth below, we grant the government's motion.

BACKGROUND[2]

Nichole Medical was a durable medical equipment supplier under the Medicare Act[3] until it ceased operations in October 2007. After receiving a "tip from a disgruntled former employee," Compl. ¶ 10, the Federal Bureau of Investigation searched Nichole Medical's records in 1998 and February 2000, which culminated in a grand jury proceeding in July 2000. The grand jury did not return an indictment, but further investigations would follow.

In 2002, a program safeguard contractor ("PSC")[4] for the Centers for Medicaid & Medicare Services ("CMS") conducted a search of Nichole Medical's Medicare records. Plaintiffs state that the PSC, TriCenturion, made an "unannounced, unauthorized and illegal search and seizure of Nichole Medical's Medicare records on or about May 20, 2002." Compl. ¶ 24. TriCenturion submitted information to the Department of Justice ("DOJ") for a possible fraud claim, which DOJ declined to pursue. Under TriCenturion's powers as a PSC, however, it could find that the contractor payment

---

[2]Unless otherwise noted, the facts are drawn from the complaint and are presumed to be correct.

[3]Medicare reimburses a supplier after it provides equipment to one or more beneficiaries. *See generally* 42 U.S.C. § 1395m(a) (2006) (providing for payment on durable medical equipment); 42 C.F.R. § 414.210 (2012) (stating payment rules). In order to be reimbursed, the supplier sends a certificate of medical necessity to a Medicare contractor. *See United States v. Isiwele*, 635 F.3d 196, 198 (5th Cir. 2011).

[4]A PSC is one of several entities that contract with the government under the Medicare Integrity Program. *See* 42 U.S.C. § 1395ddd(a) (2006) (describing the program); 42 C.F.R. § 405.370 (2012) (listing program safeguard contractors as a type of medicare contractor). Program activities include reviewing the reimbursement claims of Medicare suppliers. *See* 42 U.S.C. § 1395ddd(b) (listing the activities); 42 C.F.R. § 405.371 (stating enforcement powers of medicare contractors).

intermediary[5] had overpaid Nichole Medical for reimbursement claims. On June 29, 2004, TriCenturion sent Nichole Medical a notice of overpayment. The notice alleged that 39 of Nichole Medical's past claims for reimbursement did not meet program requirements. These claims included payment for the supply of 19 motorized wheelchairs and 20 electric hospital beds. Compl. Ex. C at 6. In order to account for the alleged overpayments, TriCenturion directed the contractor payment intermediary, Healthnow, to impose an offset against future reimbursements owed to Nichole Medical. In September 2004, Healthnow imposed the offset but immediately stayed it.

A year before the wheelchair/bed offset was stayed, the United States and the Commonwealth of Pennsylvania filed a civil action on March 3, 2003, regarding other reimbursement claims in the U.S. District Court for the Eastern District of Pennsylvania against Nichole Medical, Mr. Rotella, and other persons. Compl. Ex. A at 2. That complaint, according to plaintiffs here, "focused exclusively on Nichole Medical's billing for incontinence supplies" and alleged violations of the False Claims Act and other statutes. Compl. ¶ 12. This civil action was resolved when the parties signed the settlement agreement at issue in this case, which was effective on January 27, 2006. By this time the wheelchair/bed offset had been stayed since September 2004. Plaintiffs allege that, "Rotella, as President of Nichole Medical, understood [his] problems with CMS, Medicare and Medicaid had been brought to an end." Compl. ¶ 20.

The settlement agreement (hereinafter "SA") is attached to the complaint as Exhibit A. The SA has three sections, entitled "Parties," "Preamble," and "Terms and Conditions." The Parties section lists as participants the United States, acting through DOJ and the Office of Inspector General of the Department of Health and Human Services ("OIG-HHS"), the Commonwealth of Pennsylvania, and plaintiffs here, along with two other persons who were defendants in the district court action.

---

[5]Under the 2003 amendments to Medicare, the general term for a payment intermediary is a "medicare administrative contractor." Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 911(a)(1), 117 Stat. 2066 (2003) (codified at 42 U.S.C. 1395kk-1 (2006)); *see also Nichole Med. Equip. & Supply Inc. v. United States*, 694 F.3d 340, 342 & n.3 (3d Cir. 2012).

The Preamble explains Nichole Medical's billing history, stating that the company supplied durable medical equipment for personal care homes in Pennsylvania, beginning in June 1986. Paragraph 3 states in detail the allegations made by the United States and Pennsylvania in the civil action:

> In the Complaint the United States and the Commonwealth contended that defendants Nichole Medical's, Rotella's, Tresca's, and Oliveras' submission of certain Medicare and Medicaid claims for incontinence supplies during the period from January 1996 to February 2000 rendered those defendants liable: (i) under the civil False Claims Act; and/or (ii) the common law theories of fraud, unjust enrichment/restitution, and breach of contract. This conduct, relating to Medicaid and Medicare claims between 1996 and 2000 as described in the Complaint, will be referred to collectively as the "Covered Conduct."

SA § II.3. In addition, the Preamble states in Paragraph 4 that "[t]he United States contends also that it has certain administrative claims against Nichole Medical, Tresca, and Rotella for engaging in the Covered Conduct." SA § II.4.

The Covered Conduct, in short, relates only to plaintiffs' submission of allegedly false claims with respect to incontinence supplies between 1996 and 2000. It does not relate to other reimbursement claims, for example, claims related to the stayed offset, which concerned reimbursement for wheelchairs and hospital beds. This opinion will hereinafter refer to that offset, and all actions taken pursuant to it, as the "wheelchair/bed action."

The United States' waiver of claims, in Paragraph 5 of Section III, is specifically limited to the "Covered Conduct":

> Subject to the exceptions in Paragraph 9 below . . . the United States (on behalf of itself, its officers, agents, agencies, and departments) agrees to release Nichole Medical, Rotella, Tresca, and/or Oliveras as appropriate from any civil or administrative monetary claim the United States has or may have under the False Claims Act; the Civil Monetary Penalties Law; the Program Fraud Civil Remedies Act; or the common law theories of unjust enrichment/restitution, breach of contract

> and fraud, *for the Covered Conduct*.

SA § III.5 (emphasis added) (citations omitted). In Paragraph 14, plaintiffs waive claims that they may have against the United States, "related to the Covered Conduct and the United States' . . . investigation and prosecution thereof." SA § III.14.

In Paragraph 7, the United States waives administrative action, by agreeing that it will not rely on the Covered Conduct in order to exclude Nichole Medical from healthcare programs:

> OIG-HHS agrees to release and refrain from instituting, directing or maintaining any administrative action seeking exclusion from the Medicare, Medicaid, or other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) against Nichole Medical or Rotella under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law) or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited activities), for the Covered Conduct, except as reserved in Paragraph 9, below, and as reserved in this Paragraph.

SA § III.7. The provision concluded that, "Nothing in this Paragraph precludes the OIG-HHS from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph[s] 8 and 9, below." *Id.*

Paragraph 9, referred to in Paragraphs 5 and 7 above, specifically reserves from the government's waiver everything other than the Covered Conduct (the billing for incontinence supplies between 1996 and 2000):

> Notwithstanding any term of this Agreement, specifically reserved and excluded from the scope and terms of this Agreement as to any entity or person (including Nichole Medical, Rotella, Tresca, and Oliveras) are the following:
>
> . . . .
>
> d. Any liability to the United States or the Commonwealth (or their agencies) for any conduct other than the Covered Conduct . . . .

SA § III.9(d).

In exchange for waiver by the United States and Pennsylvania of claims arising out of the Covered Conduct, plaintiffs agreed to pay the United States $750,000. SA § III.1. This consisted of an initial payment of $150,000, followed by monthly payments. Section III, Paragraph 21 states that Nichole Medical will be in default if it fails to make payment within five days of the due date.

Upon plaintiffs' failure to cure a default in payment, the United States has specific rights. The government may "offset the remaining unpaid balance from any amounts due and owing to defendant [Nichole Medical] by any department, agency, or agent of the United States or Commonwealth at the time of the Default." SA § III.21. Nichole Medical and Mr. Rotella agree that they will not "contest any offset imposed . . . either administratively or in any state or federal court." *Id.*

The SA went into effect on January 27, 2006. Nichole Medical made the initial payment of $150,000 and made two monthly payments of $11,322.74, leaving a balance of $577,354.52. It is uncontested that the government received no further payments.

Plaintiffs allege that they are not liable because TriCenturion and a government contractor payment intermediary, National Heritage Insurance Company ("NHIC"), breached the SA by reactivating the wheelchair/bed action. In July 2006, NHIC replaced Healthnow as the intermediary for Nichole Medical's supply region. As explained above, Healthnow had imposed but then stayed an offset in September 2004, against payments owed to Nichole Medical. TriCenturion alleged the offset accounted for overpayments on claims for motorized wheelchairs and electric hospital beds. NHIC re-instituted that offset when it became the carrier, thereby intercepting payments which plaintiffs otherwise would have received as reimbursement for supplies unrelated to either the Covered Conduct or the wheelchair/bed claims. Plaintiffs allege that reimposition of the wheelchair/bed offset caused plaintiffs to be unable to pay the SA balance, leading to its cessation of operations in January 2007. *See* Compl. ¶ 35.

Plaintiffs disputed the wheelchair/bed offset in the Office of Medicare Hearings and Appeals. On February 12, 2007, an administrative law judge ("ALJ") issued an opinion. He explained that TriCenturion deemed 39 Medicare claims to be overpayments. *See* Compl. Ex. C at 6. According to the ALJ, TriCenturion treated these 39 claims as a sample on which it based

an additional offset against Nichole Medical beyond just those 39 items. The claims were "part of [a] statistical formula involving 467 claims which resulted in an extrapolated overpayment of $485,374.54." *Id.* at 7.

The ALJ addressed each of the 39 sample claims to determine whether Medicare was properly charged. He concluded that 17 of the claims met the requirements for reimbursement and were not overpayments. *See id.* at 6. Moreover, the larger offset inferred from the sample was invalid, according to the ALJ, because of procedural errors committed by TriCenturion and NHIC in taking the sample and applying the results. *See id.* at 26-27. Then-current Medicare regulations required that Nichole Medical receive written notice if its past claims for reimbursement were to be reopened. 42 C.F.R. § 405.842(a) (2007). Nichole Medical did not receive such a notice. *Id.* at 22. The ALJ further held that, according to redetermination rules, 42 C.F.R. § 405.841 (2007),[6] most of the 39 sample items could not be reopened by CMS. *Id.* at 24-25. This lack of compliance with regulations and failure to explain the methodology for the extrapolation caused the ALJ to throw out the larger offset.

On April 12, 2007, the Medicare Appeals Council ("Council") notified Nichole Medical that it would, "on its own motion," conduct a review of the ALJ's decision. Compl. Ex. B at 1. On January 31, 2008, the Council also found that TriCenturion and NHIC failed to comply with Medicare regulations. *Id.* at 7. According to the Council, however, the ALJ should not have analyzed each of the 39 claims for coverage. He should have instead deemed all items incapable of reopening by Medicare. *See id.* at 6-7 (citing 42 C.F.R. § 405.841 (2007)). The result was the entire July 2006 offset was improper and that Nichole Medical should be reimbursed, not just for 17 of the 39 claims, but all claims. Plaintiffs allege here that "approximately $101,201.44 should have been paid to Nichole Medical" in order to reverse the effects of that July 2006 offset. Compl. ¶ 41.

Plaintiffs, nonetheless, were still in apparent default on the SA. On

---

[6]An initial payment decision may be reopened "[w]ithin 12 months from the date of the notice" of that payment decision, or if good cause is shown, after those 12 months "but within 4 years" of the decision. 42 C.F.R. § 405.841(a)-(b) (2007). When evidence of fraud exists, the contractor may reopen a claim for review at any time. 42 C.F.R. § 405.841(c).

April 1, 2009, the United States made a motion to enforce the agreement in the U.S. District Court for the Eastern District of Pennsylvania. The United States made this motion in the original civil action, then-closed, which had led to the SA. The government intended to declare the $101,201.44 pending from CMS as applied against the balance still owed by plaintiffs. The district court denied the motion on March 8, 2010, stating that "the proper vehicle for the relief that the Government seeks is a new action to enforce the agreement, not a motion in this case." *United States of America v. Rotella*, No. 04-946, at 3 (E.D. Pa. filed Mar. 10, 2010) (unpublished order).

Instead of seeking a new action to enforce the SA, the United States acted on the default provision without a court order. DOJ and CMS thus directed the payment intermediary not to reimburse the $101,201.44 to Nichole Medical.

On August 9, 2012, plaintiffs filed their complaint here,[7] alleging that the United States breached the SA through the actions of intermediaries in rejecting the wheelchair/bed claims.[8] Plaintiffs request that we void the SA, require the United States to return all SA payments made by plaintiffs, and direct CMS to proceed with a $101,201.44 reimbursement for Medicare claims.

---

[7]Sometime after the Council's decision, plaintiffs filed tort claims against TriCenturion and NHIC in the U.S. District Court for the Eastern District of Pennsylvania. *See Nichole Med. Equip. & Supply, Inc. v. TriCenturion, Inc.*, No. 10-389, 2011 WL 1162052 (E.D. Pa. Mar. 28, 2011) *affirmed by* 694 F.3d 340 (3d Cir. 2012). The court held that it lacked subject matter jurisdiction because Nichole Medical's claims fell under the jurisdictional bar of 42 U.S.C. § 405(h) (2006). *Id.* at *5. It held, alternatively, that TriCenturion and NHIC are government contractors with immunity for the alleged misconduct. *Id.* at *6-7.

[8]Plaintiffs initially filed this case in the U.S. District Court for the Eastern District of Pennsylvania. On March 28, 2012, that court held that the case had to be transferred here because plaintiffs allege a breach of contract by the United States and request damages of more than $10,000. *Nichole Med. Equip. & Supply, Inc. v. United States*, No. 11-1107, 2012 WL 1033525, at *3-4 (E.D. Pa. Mar. 28, 2012).

Defendant filed a motion to dismiss under 12(b)(6) of the Rules of the Court of Federal Claims for failure to state a claim upon which relief may be granted. It contends that the SA does not contain the warranty that was allegedly breached and that plaintiffs seek to impose duties upon the government that do not exist.

DISCUSSION

The complaint alleges that the United States agreed in the SA "to conduct business with Nichole Medical within the applicable legal and regulatory structure." Compl. ¶ 49. The support for this plaintiffs find in Section III, Paragraph 25 of the SA, which provides that the "Agreement is governed by the laws of the United States." The United States breached this alleged warranty, plaintiffs assert, when TriCenturion and NHIC reopened the wheelchair/bed action, imposed an offset against payments owed Nichole Medical, and in the process did not follow Medicare regulations. As explained above, that reopening foundered when the ALJ and Medicare Appeals Council held that the intermediaries failed to comply with 42 C.F.R. sections 405.841 and 405.842(a). Plaintiffs claim that the United States pursued the offset through its contractors, thereby violating Paragraph 25 and voiding the SA.

A warranty is "an assurance by one party to an agreement of the existence of a fact upon which the other party may rely." *Dale Const. Co. v. United States*, 168 Ct. Cl. 692, 699 (1964). There was certainly no explicit warranty made by the government in the SA. The source of the terms alleged by plaintiffs is the contract itself. Plaintiffs concede that the SA does not explicitly incorporate 42 C.F.R. sections 405.841 and 405.842(a), but maintain that the government and its contractors had a duty to follow these rules because the SA "is governed by the laws of the United States." SA § III.25. This common phraseology is merely a choice of law provision, however. It does no more than select the law by which the agreement will be enforced. Paragraph 25 says nothing about how the government or its contractors will conduct future dealings with plaintiffs. *See Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 826 (Fed. Cir. 2010) (requiring that contracts explicitly incorporate, by an integration clause, statutes that are to be terms of the contract). Even if it did state the obvious–that the government and its intermediaries are obligated to follow applicable Medicare laws and regulations in the future–such an assurance would do no more than the law would require without being incorporated into the agreement. The government and its Medicare intermediaries must comply with the law. The remedy when

they do not is an administrative challenge. That is precisely what occurred in the Office of Medicare Hearings and Appeals, and plaintiffs received their relief. But a good faith failure by government employees or agents to comply with the cat's cradle of regulations implementing Medicare does not entitle plaintiffs to absolution of their independent legal obligations. Paragraph 25 does not constitute an explicit warranty of any kind, much less a warranty that government intermediaries will punctiliously adhere to applicable Medicare regulations, and if they do not, that plaintiffs' obligations under the SA are voided or that the United States will reimburse plaintiffs for any unintended financial consequences.

It would be no answer to say that what occurred here was not a good faith failure to adhere to the law. If the Medicare intermediaries intentionally failed to comply with the law in order to hurt plaintiffs, that conduct would not be a breach of contract but a tort and not, in any event, actionable here, or even in district court, under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346 (2006).[9]

Thus, while a warranty could, in theory, be implied in fact, there are no facts from which the necessary warranty could be implied. The only implied warranties between contractors and the federal government with which the court is familiar are those which arise when the United States specifies in

---

[9]Unless the United States controls the contractor's operations, the contractor is not a government employee through which the FTCA imposes liability on the United States. *See United States v. Orleans*, 425 U.S. 807, 813-14 (1976); *see also* 28 U.S.C. § 2671 (2006) (defining government employee). In addition, the United States would seem to be immune because of the operation of one or more exceptions to the FTCA. *See* 28 U.S.C. § 2680(a) (excluding claims based on government acts taken while "exercising due care, in the execution of a statute or regulation" or while "perform[ing] a discretionary function . . . whether or not the discretion involved be abused"); *id.* § 2680(h) (excepting claims that arise from "malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights"); *cf. Nichole Med. Equip. & Supply, Inc. v. United States*, 694 F.3d 340, 351 (3d Cir. 2012) (holding that immunity from state tort claims applied to the contractors here because of their "discretionary conduct that falls within the outer perimeter of their official duties").

detail how a product is to be made or how work is to be performed. *See Spearin v. United States,* 248 U.S. 132 (1918). In that circumstance, the Supreme Court has recognized an implied warranty that following the specifications will produce the desired result. *Id.* at 136-37. The present circumstances are obviously very different.

Plaintiffs' allegations are similar to those asserted in *Hercules Inc. v. United States*, 516 U.S. 417 (1996). There, a chemical company had manufactured a defoliant for the United States military to use in the Vietnam War. The company was later sued by third parties for injuries attributed to exposure to the defoliant. In rejecting an implied warranty against third-party tort liability, the Court noted, "It seems more likely that the Government would avoid such an obligation, because reimbursement through contract would provide a contractor with what is denied to it through tort law." *Id.* at 425. For the same reason, the present circumstances militate against implying a warranty. The conduct allegedly warranted against is that of third-party intermediaries, and, even if such conduct could be attributed to the United States, it was allegedly tortious.

In any event, a warranty as envisioned by plaintiffs would be inconsistent with other provisions of the SA. Section III, Paragraph 9(d) specifically reserved claims of the United States that were based on conduct other than the Covered Conduct. The contract thus did not shift any risk to the United States with regard to the wheelchair/bed action, which is by definition other conduct. *Cf. Kolar, Inc. v. United States*, 650 F.2d 256, 262 (Ct. Cl. 1981) ("[T]he dangerous property clause indicated the dangers, warned the contractor, and shifted the risk to the contractor.").

Plaintiffs also advance a second cause of action, based on an asserted violation by the United States of the implied covenant of good faith and fair dealing. They allege that:

> the United States, its constituent agencies, departments and contractors, without reasonable or probable cause, conducted improper and illegal raids, audits, and/or reopenings of investigations, violated applicable statutes and regulations, and improperly suspended and/or setoff payments to Nichole Medical, all without reasonable or probable cause, and in violation of the duty of good faith and fair dealing.

Compl. ¶ 52. This claim thus relies upon the same facts as the warranty claim, namely, the pursuit of an offset by the fiscal intermediaries arising from the wheelchair/bed action. This claim fails as well because it assumes duties in the United States that are not only beyond the agreement's terms but are plainly inconsistent with its affirmative terms.

The covenant of good faith and fair dealing exists to impose duties on one party in order to protect "the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). As noted above, the language in Section III, Paragraph 9(d) preserves the government's right to pursue claims arising out of any of plaintiffs' Medicare dealings other than the Covered Conduct. In addition, Paragraph 7 only foreswears government administrative action in pursuit of the Covered Conduct. Instead, "[n]othing in this Paragraph precludes the OIG-HHS from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph[s] 8 and 9, below." SA § III.7. In other words, plaintiffs specifically remained exposed to potential offsets arising from the wheelchair/bed claims. Because protections with respect to this other conduct were not part of the SA, no duties can be inferred with respect to the United States. The requirements of the covenant "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine*, 596 F.3d at 831. There was no violation of the covenant of good faith and fair dealing.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss is granted. Accordingly, the Clerk of Court is directed to dismiss the complaint with prejudice. No costs.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge